## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GIC PRIVATE LIMITED,

               Plaintiff,

      v.

NIO INC., BIN LI and WEI FENG

              Defendants.

Civil Action No._____

COMPLAINT

**<u>JURY TRIAL DEMANDED</u>**

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................... 9

III.  PARTIES ............................................................................................................ 9

IV.  GAAP PROVISIONS RELEVANT TO NIO'S REVENUE RECOGNITION ...................... 10

    A.   GAAP Requires Companies to Consolidate Their VIEs' Financials With Their Own ..... 12

    B.   Under GAAP, It Must Be Probable That Revenue Is Collectible Before Companies Can Recognize It on Their Books ........................................................................ 14

V.   SUBSTANTIVE ALLEGATIONS ..................................................................... 14

    A.   NIO and Its Expensive Business Model .......................................................... 14

    B.   NIO's Battery Swap Model Led to a Capital Crisis ......................................... 16

    C.   The Relevant Period Begins: Defendants Address NIO's Liquidity Crisis by Creating Weineng so That NIO Could Circumvent GAAP and Unlawfully Recognize Years of Battery Lease Revenue Immediately ........................................................ 19

        1.   Weineng Was Not Independent but a Branch of NIO's Business .............................. 23

        2.   Defendants' Plan Had Its Desired Effect: After Creating Weineng, NIO Began to Report Steadily Increasing Revenues, While Weineng (With NIO's Help) Scrambled for Cash to Fund NIO's Revenue Recognition Scheme ........................... 28

    D.   GAAP Required NIO to Consolidate Weineng's Financials into NIO's Because Weineng Was a NIO VIE, but Defendants Did Not Do So ................................................. 33

        1.   NIO Held a Variable Interest in Weineng During the Relevant Period ...................... 33

        2.   Weineng Is a NIO VIE ....................................................................... 34

        3.   NIO Was Weineng's Primary Beneficiary and Therefore Had to Be Consolidated .... 36

    E.   GAAP Required NIO to Only Recognize Revenue From Weineng That Was Probable of Collection, but Defendants Caused NIO to Recognize Millions of Weineng Revenue That Was Uncollectible Under GAAP Anyway ................................................. 36

    F.   The Truth Is Slowly Revealed: Grizzly Releases Its Report ........................................... 38

    G.   NIO Is Forced to Acknowledge the Seriousness of the Report's Allegations and Creates an "Independent" Committee to Investigate; NIO's ADSs Fall Almost 9% ........ 39

i

H. NIO's Internal Investigation into the Grizzly Report's Allegations Was Tainted From the Start................................................................................................ 40

I. Post-Relevant Period Developments............................................................. 41

1. NIO Announces That the Committee's Investigation Is Nearly Complete and Claims That Grizzly's Allegations Were Not Substantiated – Again Without Providing One Fact in Rebuttal.................................................. 41

J. After NIO Superficially Denied the Grizzly Report's Detailed Allegations, the SEC Asked NIO for an Explanation of its Accounting ............................. 42

K. NIO Responds to the SEC – Skimming the Surface and Not Providing a Full Picture of the VIE Accounting Issues ........................................................... 42

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ................... 44

A. August 11, 2020 Q2 2020 Financial Results and Conference Call.................................. 44

B. August 31, 2020 Prospectus......................................................................... 45

C. November 17, 2020 Q3 2020 Financial Results and November 18, 2020 Conference Call............................................................................................ 47

D. December 4, 2020 Prospectus...................................................................... 48

E. March 1, 2021 Q4 2020 Financial Results and March 2, 2021 Conference Call ............ 50

F. April 6, 2021 2020 Form 20-F ..................................................................... 51

G. April 29, 2021 Q1 2021 Financial Results and April 30, 2021 Conference Call............. 58

H. August 11, 2021 Q2 2021 Financial Results and August 12, 2021 Conference Call............................................................................................ 59

I. September 7, 2021 Prospectus ..................................................................... 60

J. November 9, 2021 Q3 2021 Financial Results and November 10, 2021 Conference Call............................................................................................ 63

K. February 28, 2022 6-K Supplemental and Updated Disclosures ...................... 64

L. March 24, 2022 FY2021 Financial Results and Conference Call...................... 65

M. April 29, 2022 2021 Form 20-F ................................................................... 66

N. June 9, 2022 Q1 2022 Financial Results and Conference Call........................ 74

VII. THE TRUTH IS SLOWLY DISCLOSED: GRIZZLY REVEALS THAT NIO
SIGNIFICANTLY CONTROLLED WEINENG AND USED IT TO UNLAWFULLY
PULL FORWARD BATTERY LEASING REVENUE ................................................. 75

VIII. ADDITIONAL MATERIALITY ALLEGATIONS .................................................. 77

    A.   Weineng Accounted for a Material Amount of NIO's Revenue ...................................... 77

IX. ADDITIONAL SCIENTER ALLEGATIONS............................................................ 77

    A.   Defendants Knew Their Statements Were Materially False and Misleading
         When Made ......................................................................................................... 78

        1.   Defendants Purposefully Created Weineng as an End Run Around GAAP so
             NIO Could Dig Out of a Liquidity Crisis and Recognize More Revenue
             Immediately ....................................................................................................... 78

        2.   Defendants, Who Disclosed Other VIEs, Were Well Aware of VIE Reporting
             Requirements ..................................................................................................... 78

        3.   Defendants Purposefully Set NIO's Equity Interest in Weineng at 19.84%
             in August 2021 to Remain a Fraction Below the 20% Figure – Which Creates
             a Presumption of Control .................................................................................... 80

    B.   Defendants Were Motivated to Commit Fraud ................................................................. 80

        1.   Defendants Were Motivated to Commit Fraud to Address NIO's Liquidity
             Crisis and Fund the Highly Capital-Intensive Battery Swap Business Model .......... 80

        2.   Defendants Were Motivated to Commit Fraud to Make Offerings of Inflated
             NIO Securities ................................................................................................... 80

X.  LOSS CAUSATION ......................................................................................... 81

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE ...................................... 82

XII. DIRECT RELIANCE ......................................................................................... 84

XIII. NO SAFE HARBOR ......................................................................................... 85

XIV. CAUSES OF ACTION....................................................................................... 86

XV. PRAYER FOR RELIEF ...................................................................................... 90

Plaintiff GIC Private Limited ("Plaintiff") brings this complaint to recover for damages sustained by Plaintiff on Plaintiff's purchases of NIO, Inc. securities during the period from August 11, 2020 through July 11, 2022, inclusive (the "Relevant Period"). Plaintiff brings these claims against Defendants NIO, Inc. ("NIO" or the "Company"), Bin Li, and Wei Feng (collectively, the "Individual Defendants" and together with NIO, "Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff alleges the following upon information and belief, except as to the allegations concerning Plaintiff, which are based upon Plaintiff's personal knowledge. Plaintiff's information and belief is based upon, among other things, Plaintiff's counsel's investigation, which includes without limitation, review and analysis of: (a) regulatory filings made with the Securities and Exchange Commission ("SEC"), as well as Chinese regulatory filings; (b) press releases, analyst reports, news articles, and other publications; (c) NIO's earnings and other investor conference calls; (d) other public statements by Defendants; and (d) documents filed in the lawsuit titled *Saye v. NIO Inc.*, No. 1:22-cv-07252 (S.D.N.Y.) (the "Securities Class Action"). Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will be revealed through continued investigation and discovery.

## I.    NATURE OF THE ACTION

1.    NIO is a Chinese electric vehicle ("EV") company. The Company offers consumers the option to pay a discounted price for its EVs, minus the EV battery, if they enter a five-to-six-and-a-half-year subscription agreement for the battery (the "Lease Term"). NIO initially provided this popular battery leasing service in-house, and, pursuant to Generally Accepted Accounting Principles ("GAAP"), recognized revenue for the leased batteries in monthly installments as they were paid down over the Lease Term.

2.      In early 2020, NIO faced a severe liquidity crisis due, in part, to its expensive business model of offering battery swapping as a service (as detailed *infra*). In addition to raising money from investors, which was only a temporary solution, the Individual Defendants, NIO's top brass, were determined to dig out of the liquidity crisis by orchestrating an unlawful end run around GAAP. In August 2020, Defendants, with aid from NIO cronies, created a superficially independent company called the Weineng Battery Asset Company ("Weineng" or the "Battery Asset Company"). Weineng was set up as a privately held Chinese-based entity that only reports its financial results to Chinese regulators.[1] Unbeknownst to NIO investors, including Plaintiff, Weineng's chief purpose was to "take over" NIO's battery subscription business and allow NIO to unlawfully pull forward the revenue from the leased batteries immediately.

3.      Starting in August 2020, Defendants directed Weineng to buy all the leased batteries from NIO, and, in turn, caused NIO to immediately book the full revenue from those battery sales. In FY2021 alone, Defendants caused NIO to unlawfully recognize over $600 million of leased battery revenue through Weineng. Defendants' conduct violated GAAP in several ways. First, NIO held a controlling financial interest in Weineng and was Weineng's primary beneficiary. Accordingly, under GAAP, NIO was required to disclose Weineng as a Variable Interest Entity ("VIE") and to consolidate Weineng's financial results with the Company's (which it did not do). This meant NIO could not pull forward the leased battery revenue and was required to book the revenue as payments that were made over the Lease Term. Second, GAAP also requires that companies only recognize revenue that is likely collectible. Here, Defendants caused NIO to recognize hundreds of millions of dollars in revenue from Weineng that was not likely collectible. As detailed herein, Weineng had an abysmal asset-to-liability ratio of approximately 0.36 as of December 31, 2021, demonstrating that Weineng's

---

[1] Translations of Weineng's prospectus, Credit Report, and various Chinese news articles have been made into English.

current liabilities (due within one year) were three times its current assets (usable or consumable within one year). While Weineng (in hindsight) was able to secure financing to continue its operations a staggering six times in approximately one year since its formation (with NIO's help), Weineng's ability to continue to secure financing – let alone on reasonable terms – was far from certain. Accordingly, under GAAP, regardless of Weineng's status as a VIE, NIO still could not pull forward revenue for the full Lease Term and could only recognize revenue on the leased batteries as they were paid in installments over time.

4.      Throughout the Relevant Period, Defendants issued materially false and misleading statements and omissions that misrepresented NIO's relationship to Weineng and the Company's true revenue and earnings figures. Defendants' statements artificially inflated the value of NIO securities. When the market learned the truth about NIO's accounting shenanigans, NIO's securities plunged in value, causing Plaintiff to suffer tremendous losses.

5.      Founded in 2014, NIO is a Chinese company that designs, develops, manufactures, and sells EVs. The Company went public in the U.S. in 2018. Batteries are the most expensive part of an EV, accounting for 30-40% of the total cost. NIO offers its customers a battery swapping service that allows them to swap their EV batteries at stations rather than wait many hours for their batteries to recharge. This service, which requires NIO to have an inventory of batteries on hand and ample battery swap stations, is expensive to operate.

6.      Before the Relevant Period, NIO's customers could either buy an EV at full cost with the battery, or they could buy an EV at a lower cost, minus the battery, and separately lease the battery from NIO, spreading the cost of the battery over their Lease Term. According to Defendant Li, about 40% of consumers opted to lease the battery from NIO while the Company ran its own battery

subscription service. *See* BaaS Launch Event at 23:05.[2] Analysts, however, believe the number to be greater than 90%.[3] Under GAAP, while NIO leased these batteries to consumers, the Company could only, and did only, recognize revenue from the monthly installment payments NIO received from subscribers over the Lease Term.

7.      By early 2020, however, NIO faced a serious liquidity crisis due, in part, to its costly battery swapping business model. For FY2019, NIO's net income was a staggering negative $1.6 billion. Moreover, NIO announced in February 2020 that it did not have enough cash to last another year. To dig out of this crisis, Defendants raised money from outside investors, but they knew a one-time cash infusion would only be a temporary fix. Defendants also sought a long-term solution that would have an immediate impact on NIO's balance sheet. Their answer was to create Weineng to take over NIO's "Battery as a Service" or "BaaS." Under this new BaaS model, consumers would still be able to purchase EVs at a discount and subscribe for the usage of the batteries – but now Weineng would buy the leased batteries from NIO, and consumers would (superficially) lease the batteries from Weineng. Unbeknownst to investors, this enabled NIO to pull forward years of subscription battery revenue while eliminating highly depreciating battery assets from its books, both in violation of GAAP.

8.      In August 2020, Defendants founded Weineng with three investors that they hand-selected and that were all closely related to NIO: (1) Contemporary Amperex Technology Co., Limited ("CATL") – NIO's battery supplier; (2) Hubei Science Technology Investment Group Co., Ltd. ("Hubei") – a pre-IPO NIO investor, as well as co-founder, and, as of April 2021, a 49% owner

---

[2] There is apparently no transcript of this launch event. Thus, cites are to the time on the video. *See* Baas Launch Event, *NIO Launches Battery as a Service*, NIO Newsroom (Aug. 20, 2020), https://www.nio.com/news/nio-launches-battery-service.

[3] *See* https://cleantechnica.com/2018/12/16/nio-officially-launches-nio-es8-battery-at-nio-day-2018/ ("Around 95% of ES8 owners lease their batteries, which drops the upfront price of their vehicles by 100,000 RMB($14,476).").

of NIO subsidiary Wuhan Weilai Energy Services Co. ("Wuhan Weilai");[4] and (3) a subsidiary of investment bank Guotai Junan International Holdings Limited, ("Guotai") – another NIO IPO investor. Although each investor started with a 25% voting/equity interest in Weineng, at all relevant times, NIO had a disproportionately larger economic interest in Weineng and controlled Weineng as Weineng's only revenue stream. Unbeknownst to investors, Weineng was a mere facet of NIO's business.

9.      In August 2020, NIO hosted the Weineng launch event and press conference; and it was Defendant Li who introduced Weineng to the market. During the launch event, Defendant Li claimed that Weineng was an "independent" company, but as discussed *infra,* Weineng was anything but independent. In fact, Defendants completely controlled Weineng, including by directing nearly every facet of Weineng's operations for NIO's benefit and by installing several overlapping senior managers to oversee Weineng.

10.     As detailed *infra*, unlike any other Weineng investor, NIO set the terms of the contracts with Weineng, maintained the batteries and services connected with them, guaranteed Weineng's contracts, was liable for defaults by subscribers up to a certain amount, and collected revenue for Weineng. Additionally, there was no distinction between NIO-owned batteries and Weineng-owned batteries – the two were routinely interchanged and intermingled at the various swapping stations, all of which were run by NIO.

11.     Significantly, NIO also helped Weineng secure the financing necessary to continue purchasing Company batteries, without which NIO would face the same liquidity crisis that it had before. Defendants directed Weineng to purchase all of the leased batteries from NIO, but Weineng only received monthly payments from lease customers (which were paid directly to Wuhan Weilai, a

---

[4] "Weilai" is another word for "NIO" or "blue sky coming" in Chinese.

NIO subsidiary, and then reverted to Weineng). This model was not economically sustainable. Accordingly, Weineng had to borrow money a staggering six times during the Relevant Period to pay NIO – with NIO itself facilitating and/or securing financing for Weineng on several occasions. Relatedly and further demonstrating NIO's disproportionate influence over Weineng, Defendant Li boasted that other investors who were interested in investing in Weineng came to him as the gatekeeper of the supposedly independent company. *See infra* ¶ 82.

12.     In light of the foregoing, and as detailed more fully herein, Weineng exhibited the characteristics of a NIO VIE. Therefore, NIO should have consolidated Weineng's revenues into the Company's financial statements under GAAP. NIO held a controlling financial interest in Weineng – far greater than the other three Weineng founding investors. At its peak during the Relevant Period, NIO's actual economic interest in Weineng reached 55% because, in addition to its equity interest, NIO was also owed a whopping RMB1.5 billion from Weineng – approximately $225,000,000. NIO was also Weineng's primary beneficiary, and unlike any other investor, NIO needed Weineng to further its revenue recognition scheme and practically ran Weineng's business. Because Weineng was a NIO VIE whose financials had to be consolidated with NIO's, NIO could not recognize the full revenues from the battery sales as it did but instead had to recognize revenue in installments as it was paid during the Lease Term.

13.     Even if Defendants did not have to consolidate Weineng as a VIE, Defendants caused NIO to violate GAAP's revenue recognition provision. NIO recognized hundreds of millions of dollars in revenue from Weineng that was not likely collectible. As detailed herein, Weineng had an abysmal asset-to-liability ratio of approximately 0.36 as of December 31, 2021, demonstrating that Weineng's current liabilities (due within one year) were three times its current assets (usable or consumable within one year).

14.     Weineng made an immediate and material difference to NIO's balance sheet as NIO's financials dramatically improved and its revenues skyrocketed during the Relevant Period. NIO more than doubled its revenue in Q42020. NIO reported Q42020 revenue of RMB6.64 billion, compared with RMB2.85 billion in Q42019 (when it was leasing the batteries itself). Likewise, for FY2021, NIO reported revenue of RMB26.13 billion, in comparison with RMB16.25 billion for FY2020, during eight months of which NIO leased the batteries itself. During 2021 alone, NIO recognized over RMB4 billion, or approximately $600,000,000, in revenue from Weineng, which it could not have recognized during this period if Weineng was consolidated. For the nine months ended September 30, 2022, NIO had revenue of RMB13 billion, compared to revenues of RMB9.8 billion for the nine months ended September 30, 2021.

15.     NIO's battery swapping stations also grew meteorically during the Relevant Period. At the beginning of the Relevant Period, in August 2020, NIO had 143 battery swap stations. By the end of the Relevant Period, in July 2022, NIO had almost eight times as many – nearly 1,100. The number of customers opting for battery leasing also grew during the Relevant Period. In November 2020, the percentage of customers choosing to lease EV batteries through Weineng was 35%. By early 2021, it was 55%. By November 2021, it had risen to 92%. The rosy, but materially misleading picture that Defendants presented to investors by using Weineng as its pawn caused NIO's American Depository Share ("ADS") price to close at a Relevant Period high of $64.84 on February 9, 2021.

16.     On June 28, 2022, however, NIO's charade began to unravel. On that date, investment analyst Grizzly Research LLC ("Grizzly") published a research report entitled, "We Believe NIO Plays Valeant-esque Accounting Games to Inflate Revenue and Boost Net Income Margins to Meet Targets" (the "Grizzly Report"). The Grizzly Report detailed how NIO extensively controlled Weineng, which was little more than a front for NIO which was created to (fraudulently) allow NIO

to recognize battery leasing revenue immediately. On June 28, 2022, NIO's ADSs closed at $22.36, down 2.5% from its June 27, 2022 closing price of $22.95.

17.     Defendants were quick to dismiss the Grizzly Report on the date it was issued, which helped mitigate the investor response. Defendants' conclusory dismissal, however, did not provide any reasoning as to why they believed the Grizzly Report to be meritless.

18.     On July 11, 2022, the last day of the Relevant Period, the market realized the seriousness of the Grizzly Report's allegations against NIO. On that date, in contrast to NIO's conclusory claim that the Grizzly Report was meritless, the Company announced that it was forming a purportedly independent committee (the "Committee") comprised of NIO directors Denny Ting Bun Lee, Hai Wu, and Yu Long to oversee an investigation regarding the Grizzly Report's allegations. As set forth *infra*, the Committee was far from independent. NIO also announced that it was appointing an undisclosed law firm and undisclosed accounting firm to review Grizzly's allegations. After these disclosures, underscoring the seriousness of the Grizzly Report's allegations, NIO's ADSs fell almost 9%, from a closing price of $22.60 per share on July 8, 2022 to close on July 11, 2022 at $20.57 per share. The effect on NIO investors was huge as NIO lost $2.6 billion in market capitalization in one day.

19.     On August 26, 2022, after the close of the Relevant Period, NIO issued a four-sentence press release stating that the Committee's supposedly independent investigation was almost done and that Grizzly's claims were thus far unsubstantiated. NIO, however, did not provide a single fact supporting its supposed claim that Grizzly's allegations were unfounded. The market was not convinced as NIO's ADS price continued to drop that day. To date, the Committee still has not issued a final report on the results of its investigation. The SEC also made an inquiry into NIO's accounting after the Company's unsatisfactory responses to the Grizzly Report, but it too has not yet taken further action against the Company.

20.     All told, investors suffered massive losses due to Defendants' misstatements and omissions of fact.

## II.    JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to the Exchange Act and certain rules promulgated by the SEC. Specifically, this Complaint asserts claims under: (1) Section 10(b) of the Exchange Act ("§10(b)") and Rule 10b-5 promulgated thereunder by the SEC (*see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5); and (2) Section 20(a) of the Exchange Act ("§20(a)") (*see* 15 U.S.C. § 78t(a)).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because NIO's ADSs trade on the New York Stock Exchange ("NYSE"), including in this District.

24.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

25.     Plaintiff GIC was incorporated in 1981 under the Singapore Companies Act. It is headquartered in Singapore and has offices in numerous locations worldwide. During the Relevant Period, GIC purchased 54,458,148 NIO ADSs at prices that were inflated artificially by Defendants' fraud in reliance on the misrepresentations alleged herein and/or on the integrity of the market for NIO ADSs.

9

26.    Defendant NIO is incorporated under the laws of the Cayman Islands with its principal executive offices located in Shanghai, China. NIO's ADSs trade on the NYSE under the symbol "NIO."

27.    Defendant Bin Li ("Li") was NIO's Chief Executive Officer ("CEO") at all relevant times.

28.    Defendant Wei Feng ("Feng") was NIO's Chief Financial Officer ("CFO") at all relevant times.

29.    Defendants Li and Feng (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's SEC reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants, who were also responsible for supplying NIO's auditor with complete and accurate information (including about VIEs), were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that Defendants were misrepresenting NIO's relationship with Weineng, that NIO had reported and falsely inflated revenues and earnings, and that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public. The Individual Defendants are liable for the misleading statements pleaded herein.

## IV.    GAAP PROVISIONS RELEVANT TO NIO'S REVENUE RECOGNITION

30.    GAAP is established in recognition of the numerous financial reporting objectives, including providing "financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity" *See* Statement of Financial Accounting Concepts No. 8, Conceptual Framework for Financial

Reporting – Chapter 1, The Objective of General Purpose Financial Reporting, and Chapter 3, Qualitative Characteristics of Useful Financial Information, Financial Accounting Standards Board (Sept. 2010) at ¶¶ OB2, QB12, BC1.24, QC6. GAAP further provides that, if financial information is to be useful, it must be relevant and faithfully represent what it purports to represent. SEC Regulation S-X (17 C.F.R. § 210.4 01) provides that: "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

31.     As an SEC registrant, NIO, and the Individual Defendants specifically, are responsible for issuing and fairly presenting the Company's consolidated financial statements in accordance with GAAP and SEC Rules. The professional standards adopted by the Public Company Accounting Oversight Board ("PCAOB"), known as the PCAOB Auditing Standards ("AS"), provide, in pertinent part:

> Management is…responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management…. The fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

32.     NIO management's responsibility included, but was not limited to, ensuring that the Company properly recognized revenue, disclosed its VIEs, and filed consolidated financials including all VIEs. NIO management likewise was responsible for providing complete and accurate information to the Company's auditors to ensure the accuracy of its financial audits and reports. In fact, management is routinely required to certify to the auditor that it has provided complete and accurate information to the auditor as part of the auditor's engagement.

33.     At all times relevant, NIO asserted that its consolidated financial statements were prepared in accordance with US GAAP.[5]

A.     **GAAP Requires Companies to Consolidate Their VIEs' Financials With Their Own**

34.     GAAP generally requires companies to consolidate any entity in which it holds a controlling financial interest. Controlling financial interests may be held through variable interests or voting interests. As such, the two primary consolidation models under GAAP are the variable interest model and the voting interest model. After the infamous Enron scandal, use of the variable interest model became critical for determining whether a controlling financial interest exists because of the increasing use of VIEs, and because it analyzes beyond voting rights, the underlying financial realities.[6] Indeed, consolidation evaluations always begin with the variable interest model, which applies to all entities, with certain limited exceptions. Here, as set forth *infra*, NIO should have consolidated Weineng into the Company's financial statements because NIO held a controlling financial interest in Weineng under GAAP's variable interest model.

35.     GAAP contains several criteria under Accounting Standards Codification ("ASC") 810 to determine whether an entity requires consolidation under the variable interest model, including the following three steps. First, a company must hold a variable interest – such as an investment – in an entity. *See*, *e.g.*, ASC 810-10-05-06; ASC 810-10-55-16 through 55-41. Second, to qualify as a VIE (a) an entity must lack sufficient equity at risk to finance its activities without additional subordinated financial support, (b) the equity holders, as a group, must lack the characteristics of a controlling financial interest, or (c) the entity must be structured with non-substantive voting rights (*i.e.*, an anti-abuse clause). *See*, *e.g.*, ASC 810-10-05-06; ASC 810-10-15-14. Third, the company

---

[5] *See*, *e.g.*, NIO 2021 Form 20-F at 10, 41.

[6] *See* Anthony H. Catanach Jr. & Shelley Rhoades-Catanach, *Enron: A Financial Reporting Failure*, 48 Vill. L. Rev. 1057 (2003), *available at* https://digitalcommons.law.villanova.edu/cgi/viewcontent.cgi?article=1339&context=vlr.

holding the variable interest in the VIE must be the VIE's "primary beneficiary" under GAAP, meaning it has both (a) the power to direct the entity's activities that most significantly impact its economic performance, and (b) the obligation to absorb potentially significant losses of the entity, or the right to receive potentially significant benefits from the entity. *See*, *e.g.*, ASC 810-10-05-06; ASC 810-10-25-38A through 38J; ASC 810-10-25-42.

36.     As to the non-substantive voting rights prong, GAAP clarifies that voting rights are non-substantive if (1) they are not proportional to their economic interest, *i.e.*, not proportional to the entity's expected losses and rights to expected residual returns, and (2) when substantially all of the entity's activities either involve, or are conducted on behalf of, the investor(s) with disproportionately fewer voting rights, *e.g.*, when an entity's major activities include purchasing substantially all of its purchased products from the reporting entity and the principal purpose of the entity is to conduct a business that is uniquely complementary to a significant business operation of the reporting entity. *See*, *e.g.*, ASC 810-10-15-14(c). As described below, this was precisely the relationship between NIO and Weineng – during the Relevant Period, Weineng bought all of its assets (EV batteries) from NIO and conducted its business through NIO subsidiary Wuhan Weilai, which was "uniquely complementary" to NIO's business.

37.     The non-substantive voting rights prong is intended to identify entities that are structured to avoid consolidation under the voting interest model by providing non-substantive voting rights to another party. It is also meant to catch attempts by companies to avoid consolidating their financial statements with their VIE's financial statements where the voting rights held by the entity's investors are not useful in identifying which party has a controlling financial interest. *See*, *e.g.*, ASC 810-25-38A through 25-44. If a company has a VIE, then it must determine if it is the primary beneficiary of that VIE. *See*, *e.g.*, ASC 810-10-05-06; ASC 810-10-25-38A through 38J; ASC 810-10-25-42. If so, the company must consolidate the VIE's financials with its own.

**B.    Under GAAP, It Must Be Probable That Revenue Is Collectible Before Companies Can Recognize It on Their Books**

38.    GAAP sets general rules for revenue recognition, including that revenue must likely be collectible from a customer before a company recognizes it as revenue. ASC 606-10-05-4 permits the recognition of revenue only when (or as) the entity satisfies a performance obligation. In context here, NIO had to evaluate its customer contracts – here, with Weineng – for revenue recognition and analyze whether it was "probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods." ASC 606-10-25-1(e). In addition, in evaluating whether collectability of an amount of consideration is probable, an entity shall consider only the customer's ability and intention to pay that amount of consideration when it is due. *Id.*[7] Here, collectability was unlikely given Weineng's low asset-liability ratio and uncertainty in securing financing. *See infra* ¶¶ 107-112.

39.    GAAP further clarifies that companies may recognize revenue "only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved." ASC 606-10-32-8. That is, to the extent NIO was unable to conclude that it was probable that a significant reversal in the amount of cumulative revenue recognized would not occur, NIO was precluded from recognizing revenue.

**V.    SUBSTANTIVE ALLEGATIONS**

**A.    NIO and Its Expensive Business Model**

40.    NIO, founded by Defendant Li in 2014, designs, develops, and sells EVs. In

---

[7] ASC 606-10-25-1(e). *See also* ASC 606-10-55-3A and ASC 606-10-55-3B (Implementation Guidance) ("The objective of this assessment is to evaluate whether there is a substantive transaction between the entity and the customer, which is a necessary condition for the contract to be accounted for under the revenue model" and "[i]t requires an entity to use judgment and consider all of the facts and circumstances, including the entity's customary business practices and its knowledge of the customer, in determining whether it is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods…").

September 2018, NIO went public in the United States through an initial public offering, raising $1.095 billion from United States investors.

41.    NIO gives consumers the option to purchase an EV at a discounted rate, minus the battery, if they agree to lease the EV battery over a specified Lease Term. Since NIO's inception, all its EVs have been equipped with vehicle-battery separation technology that allows for battery swapping in addition to conventional charging. To accommodate this technology, NIO maintains a series of stations where a NIO vehicle owner can swap the vehicle's depleted battery for a charged battery without having to wait for their own battery to recharge. NIO's battery swapping service requires NIO to have, *inter alia*, an adequate inventory of batteries and service stations to operate effectively. Accordingly, while the battery leasing option is popular with consumers who wish to pay less up front for an EV, it is a costly operation for NIO to maintain.

42.    Before the Relevant Period, NIO offered a "Battery Payment Arrangement" directly to consumers who entered a (five-to-six-and-a-half year) subscription agreement for the EV battery.[8]

43.    Under this Battery Payment Arrangement, when NIO sold the vehicle and leased the battery, it would recognize revenue from the battery rental on a monthly basis as NIO received payment from the renter. To account for these transactions, NIO allocated the battery transaction price to two components: (i) the value relating to the amount initially paid for the battery; and (ii) the value relating to the unpaid financing component of the transaction. While the amount allocated to the paid amount would be recognized into revenue immediately, the financing amount would be deferred as "unrealized finance income" and recognized over the financing period. Because NIO still owned the

---

[8]    Nio, Inc., *NIO Launches ES8 SUV with New User Experience*, Business Wire (Dec. 18, 2017), https://web.archive.org/web/20200709165640/https://www.businesswire.com/news/home/20171218005356/en/NIO-Launches-ES8-SUV-New-User-Experience (archived at Wayback Machine) ("[a] battery rental plan is available to NIO users, which provides a RMB100,000 discount on the purchase price of the ES8" and that the "battery rental subscription [is] RMB1,280 per month").

leased battery packs, NIO also had to write down the value of the rapidly depreciating batteries on its balance sheet by approximately 10%-20% per year.

44.     In August 2020, Defendant Li estimated that 40% of consumers opted for the battery payment arrangement. However, analysts have estimated the actual percentage of consumers opting to lease the battery could have been as high as 95% during the same period.[9]

**B.     NIO's Battery Swap Model Led to a Capital Crisis**

45.     NIO's battery swap model requires substantial upfront investment and yields minimal monthly payments in return. Accordingly, when NIO ran its battery subscription service in-house, it was unable to generate a profit because the swap model was so capital intensive.

46.     NIO's battery swapping model was capital intensive for several reasons, including that: (i) the batteries themselves are very expensive;[10] (ii) NIO had to have more batteries in circulation than vehicles so fully charged batteries were available when drivers with a depleted battery arrived at a swap station; (iii) EV batteries last only five to six and a half years, degrading rapidly and depreciating in value by approximately 10-20% per year; and (iv) NIO had to build a network of battery swap stations,[11] each of which requires automated technology that performs the battery swap in 3-5 minutes, holds a maximum of 14 batteries, and necessarily requires substantial electricity to charge the depleted batteries on an ongoing basis.[12]

---

[9] *NIO Officially Launches NIO ES8 Battery At NIO Day 2018 — CleanTechnica Report & Pictures*, CleanTechnica (Dec. 16, 2018), https://cleantechnica.com/2018/12/16/nio-officially-launches-nio-es8-battery-at-nio-day-2018/.

[10] In October 2018, an analyst report published by Deutsche Bank estimated that the battery pack for NIO's model ES8 accounted for 30% of the total vehicle cost. This is consistent with the industry as a whole. *See Electric Vehicle Battery Costs Soar*, Institute for Energy Research (Apr. 25, 2022), https://www.instituteforenergyresearch.org/renewable/electric-vehicle-battery-costs-soar/#:~:text=Along%20with%20battery%20materials%20costs,and%20copper%20have%20also%20increased.&text=Batteries%20account%20for%20about%2030,price%20of%20an%20electric%20vehicle ("[B]atteries account for about 30 to 40 percent of the price of an electric vehicle.").

[11] The first generation of battery swap stations held fewer batteries.

[12] Andrei Nedelea, *Take A Closer Look At A Nio EV Battery Swapping Station In China*, InsideEVs (Feb. 28, 2022), https://insideevs.com/news/570403/nio-battery-swap-station-china/; *see also* Phate Zang, *Analyst says battery swap*

**[Footnote continued on next page]**

47.    Like other EV companies, including the Better Place company and Tesla, that tried and failed to employ a similarly capital-intense battery swap business model, NIO quickly ran into liquidity issues in 2019.[13] For FY2019, NIO's net income was a staggering **negative $1.6 billion**. As such, by February 2020 NIO was facing a serious liquidity crisis.

48.    A February 7, 2020 article by Jill Shen stated that "[c]ash-strapped electric vehicle maker Nio has raised $100 million in convertible bonds, relieving immediate cash flow concerns, but now faces delivery delays for its February shipment amid a viral outbreak that has brought much of the country to a standstill."[14] The article continued as follows:

> The cash infusion may temporarily alleviate financial pressures for the troubled EV maker, which had just RMB2.55 billion ($357.3 million) in cash and equivalents as of the third quarter of last year. However, given the company's difficulty raising financing, there has been growing concern among investors about whether it will be able to pay for its ambitious growth plans in its competition with Tesla.

49.    A February 25, 2020 article, also by Jill Shen, reported that NIO needed to be bailed out by a "strategic investment" from the investment arm of a Chinese provincial level governmental authority – to the tune of over $1 billion:

> Cash-strapped electric vehicle maker Nio on Tuesday announced that it has reached an agreement with officials in the eastern Chinese city of Hefei, where the company's joint manufacturing plant with JAC Motors is located.
>
> Why it matters: **The long-awaited funding deal is expected to provide relief for the Tesla challenger from a liquidity crisis**, and allow for the launch of its third electric SUV model scheduled for delivery in September.

---

stations won't put big financial strain on Nio, CnEVPost (Oct. 8, 2021), https://cnevpost.com/2021/10/08/analyst-says-battery-swap-stations-wont-put-big-financial-strain-on-nio/.

[13] See Max Chafkin, *A Broken Place: The Spectacular Failure Of The Startup That Was Going To Change The World*, Fast Company (Apr. 7, 2014), https://www.fastcompany.com/3028159/a-broken-place-better-place; *see also* Better Place (company), https://en.wikipedia.org/wiki/Better_Place(company) ("The company's financial difficulties were caused by the high investment required to develop the charging and swapping infrastructure"); Jason Lomberg, *Why Did Tesla Give Up on Battery Swapping?*, Power Systems Design (May 2, 2022), https://www.powersystemsdesign.com/articles/why-did-tesla-give-up-on-battery-swapping/145/18891 ("Despite several companies … clinging to the idea, battery swapping is dead, and Tesla caught wind of that before it was too late.").

[14] Jill Shen, *Nio raises $100 million but faces delivery delays*, TechNode (Feb. 7, 20220), *available at* https://technode.com/2020/02/07/nio-100-million-convertible/.

> Details: Nio and the government of Hefei, the capital of eastern Anhui province, signed a framework agreement on Tuesday morning at a plant jointly owned by the company and JAC, according to an announcement released by the government on its official Weibo account (in Chinese).
>
> Nio has yet to reveal the details of the funding agreement, but the government expects the investment will exceed RMB10 billion ($1.4 billion), making the company "an EV major" and enabling annual output of RMB100 billion in revenue over the next five years.
>
> Nio will relocate its China headquarters to Hefei, including its research and development, sales and marketing, and manufacturing facilities, company president Qin Lihong confirmed on Tuesday in a WeChat Moments post.[15]

As of December 31, 2019, NIO's current liabilities exceeded its current assets in the amount of RMB4.6 billion. *See* NIO 2019 Form 20-F at 108. Accordingly, this capital infusion would temporarily help but not solve NIO's fundamentally capital-intensive business model in the long term. Defendants realized that they still had to figure out a more sustainable solution to this liquidity crisis that would allow them to recognize revenue from leased battery assets much faster.

50.    A February 25, 2020 Credit Suisse analyst report by Bin Wang, Nick Li, and Carrie Jiang noted that "[w]e expected share price to react positively to this new framework, as this big-ticket cash inflow should relieve some ***investors' concerns about NIO's cash flow position***."

51.    A February 27, 2020 article further reported that NIO was struggling to survive and that the Company had "lost more than $6 billion since it was founded in 2014" and had announced that without securing additional financing, ***it did not have enough cash to last another year***:

> Leading Chinese electric vehicle startup Nio has struggled over the last year or so, and ***recently warned shareholders that it needs new outside investment in order to make it through 2020***. This week, the Tencent-backed company announced a potential $1.4 billion deal with a local government that just might fit that bill. And with the coronavirus cratering car sales in China, it couldn't have come at a better time — if the deal closes….

---

[15] Jill Shen, *Nio reaches strategic investment deal with Hefei government*, TechNode (Feb. 25, 2020), *available at* https://technode.com/2020/02/25/nio-reaches-strategic-investment-deal-with-hefei-government/ (emphasis added).

Nio, which became a publicly traded company in the US in 2018 ***and has lost more than $6 billion since it was founded in 2014***, didn't mince words about this either. At the end of 2019, Nio announced that its "cash balance is not adequate to provide the required working capital and liquidity for continuous operation in the next 12 months," and admitted that its "continuous operation ... depends on the Company's capability to obtain sufficient external equity or debt financing."[16]

**C.    The Relevant Period Begins: Defendants Address NIO's Liquidity Crisis by Creating Weineng so That NIO Could Circumvent GAAP and Unlawfully Recognize Years of Battery Lease Revenue Immediately**

52.    On August 11, 2020, NIO held a conference call with analysts in which they discussed the formation of Weineng – the long-term solution Defendants devised to address NIO's liquidity crisis. Shortly thereafter, on August 18, 2020, Defendants formed Weineng with three other investors. At all times relevant, however, Weineng's chief purpose was to serve NIO's interests. Specifically, Weineng was designed to purchase the leased batteries from NIO – its only customer – and gave the Company a pretext to wrongfully circumvent GAAP by recognizing the full revenue from the leased batteries immediately, while simultaneously offloading the rapid depreciation of those assets to Weineng.

53.    Defendants repeatedly misrepresented to investors that Weineng was an independent company from NIO. In fact, every facet of Weineng's business was designed by NIO to serve NIO, and the entity itself was owned and controlled by NIO, and several of its cronies, to ensure it would only further NIO's interests.

54.    For starters, Defendants cherry-picked each of the three other initial equity investors in Weineng, all of which had close ties to NIO. These investors included:

1)    **CATL**. CATL manufactures all of NIO's batteries, and NIO is consistently one of CATL's largest customers.

---

[16] Sean O'Kane, *Nio inks a $1.4 billion bailout as coronavirus sinks sales The company was struggling even before the outbreak*, The Verge (Feb. 27, 2020), *available at*  https://www.theverge.com/2020/2/27/21155949/nio-hefei-investment-ec6-bailout-coronavirus-china.

2)   **Hubei**. Hubei is a pre-IPO investor in NIO. Hubei also co-founded NIO subsidiary Wuhan Weilai in May 2017 and owned 49% of Wuhan Weilai as of April 2021.[17] Hubei is also affiliated with the Wuhan East Lake New Technology Development Zone Management Committee – the location of NIO's headquarters and the governmental entity backing the construction of NIO's industrial park.

3)   **Guotai.** Guotai serves as NIO's "compliance advisor to provide advice and guidance to [NIO] in respect of compliance with the applicable laws and regulations." Specifically, Guotai's role as NIO's compliance advisor required it to advise NIO regarding "transactions in which any beneficiary of weighted voting rights in [NIO] has an interest; and where there is a potential conflict of interest between [NIO], its subsidiary and/or Shareholders (considered as a group) on one hand and any beneficiary of weighted voting rights in [NIO] on the other." And, according to Defendant Li, Guotai was brought in to "help us [(NIO and Weineng)] issue ABS," *i.e.*, to underwrite asset backed financing offerings so that the battery asset company can purchase NIO's batteries on NIO's command.

55.   Each of the initial investors started with a 25% voting/equity interest in Weineng, but this percentage was meaningless: NIO's true economic interest was always disproportionately greater than that of the other investors (*see infra* ¶¶ 100-105). Tellingly, Defendants calculatingly changed NIO's voting/equity interests in Weineng during the Relevant Period to further its fraudulent accounting scheme without losing any control over Weineng. For example, NIO's equity/voting interest in Weineng was 25% from August 2020 through December 2020. However, in December 2020, a mere three months after Weineng was founded, Defendants authorized NIO's equity/voting interests to decline to 13.89% so that the Company could help facilitate Weineng's capital raise of RMB640 million. Defendants were willing to superficially lower NIO's 25% equity interest to 13.89% at this time because Weineng badly needed money to continue to buy batteries from NIO. Despite reducing its equity interest, NIO continued to completely control Weineng's business. *See* ¶¶

---

[17] *See* Hong Kong Prospectus, Overseas Regulatory Announcement – Introductory Document, NIO, Inc. (May 13, 2022), *available at* https://portalvhds1fxb0jchzgjph.blob.core.windows.net/press-releases-attachments/1416980/HKEX-EPS_20220513_10260181_0.PDF; *see also Another NIO, another NIO, and another NIO?*,   Sohu (May 28, 2019), https://www.sohu.com/a/316926885_100044558.

62-75. In furtherance of the Company's revenue recognition scheme, when the time was right, NIO would have no problem increasing its equity interest again – and it did just that in August 2021.

56.     On August 16, 2021, NIO's equity/voting interest rose again – this time higher than any other investor to 19.84%. Notably, NIO's calculated 19.84% voting interest in Weineng was a hairsbreadth under the 20% equity voting figure that Defendants knew would provide a presumption under GAAP that NIO significantly controlled Weineng – a factor militating strongly in favor of finding Weineng to be a VIE requiring consolidation with NIO's financial statements. *See* ASC 323-10 ("[a]n investment (direct or indirect) of 20 percent or more of the voting stock of an investee shall lead to a presumption that in the absence of predominant evidence to the contrary an investor has the ability to exercise significant influence over an investee").

57.     As noted *supra*, NIO's interests in Weineng were substantially different from any other investor in Weineng. NIO, unlike the other Weineng investors, needed Weineng to buy its leased battery assets so that NIO could immediately recognize all the revenue from those sales. This would transform NIO's balance sheet and stave off the Company's liquidity crisis. Additionally, NIO was Weineng's only source of revenue during the Relevant Period. This relationship ensured that NIO had disproportionate control over Weineng.

58.     On August 20, 2020, NIO held an official launch event for Weineng. During that event, Defendant Li (as opposed to a Weineng founder, director, or employee) introduced Weineng and spoke about its purpose, *i.e.*, to serve NIO. Defendant Li explained that a "prerequisite" to NIO's battery-swap model was "establish[ing] an independent battery asset company." The event was held at NIO House in China. Weineng's Chairman and Legal Representative Shen Fei – who is also Vice President of NIO's subsidiary Wuhan Weilai – sat in the front row.

59.     Defendant Li openly acknowledged at the BaaS launch event that for NIO's sake, "[t]here must be someone to hold the battery assets. Otherwise we have to hold them by ourselves.

21

*But that will be too much a financial burden....What to do? So an independent battery asset company is needed.*" BaaS Launch Event Video at 10:13. Defendant Li also noted at that time that "NIO takes responsibility for the whole system including the battery asset management." *Id.* at 23:00. Defendant Li then displayed two separate invoices on a video screen, one for the vehicle, one for the battery. The battery invoice was not from Weineng but from a NIO subsidiary in Wuhan. *Id.* at 26:00.

60.    During the launch event, Defendant Li also underscored how Weineng singularly created value for NIO. Specifically, Defendant Li explained that Weineng would "strengthen NIO's bargaining power in the supply chain, further improve NIO's system efficiency, and push up corporate gross profit."

61.    Following the launch event, on August 25, 2020, securities analyst Phate Zhang reported, *inter alia*, that NIO "established" Weineng as "important support" to address the Company's liquidity crisis, in relevant part, as follows:

> [O]n August 18, ***Weineng battery assets launched by NIO and partners such as Contemporary Amperex Technology (CATL), China's largest automotive lithium-ion battery maker Weineng will be an important support for NIO's BaaS operations, solving the problem of funding battery operations....fundamentally, battery swap is still a kind of asset-heavy operation, the high cost of battery, and the construction of battery swap station is still a problem to be faced***. Tesla once gave up the battery swap mode, under the BaaS model, NIO can succeed? How to generate more business value in the future is the next question NIO needs to think about.... William Li Bin said that after the BaaS model closed loop is formed, the goal of building 1100 battery swap stations will definitely be achieved in the future. The slower than expected construction of battery swap stations is due to multiple factors.... ***On the one hand, the battery swap station construction needs to invest a lot of money, and NIO's capital chain is not very rich***.... On the other hand, although NIO had already launched a battery rental business, the battery still belonged to the user, so only the technical separation of the body and the battery was achieved, but not the separation of the body and the battery in terms of property rights.... ***Also, at that time, NIO had to bear the heavy cost of batteries***. ***To a certain extent, NIO had to reduce its burden in order to run the battery swap mode smoothly. Otherwise, NIO will not have enough capital to push the battery swap business model forward***.... Wuhan Weineng Battery Assets Company, a battery asset company ***established by*** and in cooperation

with NIO, was incorporated on August 18 with a registered capital of RMB800 million, jointly sponsored by CATL New Energy Technology Co.[18]

### 1.    Weineng Was Not Independent but a Branch of NIO's Business

62.    Throughout the Relevant Period, Weineng was a mere facet of NIO's business. NIO supplied Weineng with all of its customers (which, during the Relevant Period, were all NIO customers), singularly controlled the relationship with those customers (even potentially to Weineng's detriment), and even installed its own loyal senior managers at Weineng to oversee operations. No other investor in Weineng was similarly situated. In fact, the other investors were at NIO's mercy vis-a-vis Weineng because Weineng's only revenue source came from NIO.

63.    NIO explained in its 2020 Form 20-F, filed with the SEC on April 6, 2021, and its 2021 Form 20-F, filed with the SEC on April 29, 2022, that Weineng was "***dedicated*** to purchasing [from NIO] and owning the assets of battery packs which are subscribed by users under BaaS." NIO further explained that it set the prices for its EVs, for the EV batteries, for the battery swap network, and for the BaaS program.[19]

64.    In fact, NIO could opt to discontinue or alter the BaaS program at any time. *See* BaaS Launch Event Video at 23:00 (Defendant Li stating that "NIO takes responsibility for the whole system including the battery asset management").[20] According to Weineng's April 2022 prospectus for an ABS offering, NIO's subsidiary even collected the monthly subscription payments from customers on behalf of Weineng. *See* Weineng Prospectus at 35, 92 ("According to transaction

---

[18]    *See Is Nio's battery swap mode commercially viable?*, CnEVPost (Aug. 25, 2020), https://cntechpost.com/2020/08/25/is-nios-battery-swap-mode-commercially-viable/.

[19] In May 2022, NIO exercised its unilateral decision-making power to increase BaaS battery rental prices. *See* Phate Zhang, *Nio to hike prices on May 10, including vehicle prices and battery rental fees*, CnEVPost (Apr. 10, 2022), *available at*: https://cnevpost.com/2022/04/10/nio-to-hike-prices-on-may-10/ ("The BaaS battery rental price will be adjusted from RMB1,480/month to RMB1,680/month for the long-range battery pack. The standard range battery pack rental service fee will remain unchanged at RMB980/month. Customers who have already purchased a vehicle are not affected by this adjustment."); *Nio launches BaaS battery rental service, brings car prices down by about $10,000*, CnEVPost (Aug. 20, 2020), https://cnevpost.com/2020/08/20/nio-launches-baas-battery-rental-service/.

[20] NIO apparently did not release a transcript of this event.

arrangement [between Weineng and NIO], NIO Finance [was] responsible for … deducting rental fees from subscribers' designated accounts and transferring the fees to an account of Wuhan Weineng on each payment due date on a monthly basis."); *see also* BaaS Launch Event at 26:00 (displaying invoice for BaaS subscription from NIO Finance).

65.    Furthermore, unlike the other three Weineng investors, NIO was uniquely responsible for part of Weineng's losses in the event of customer defaults. If a BaaS subscriber failed to make the monthly payments, only NIO would have to compensate Weineng for a portion of the default. *See* NIO 2020 Form 20-F at 104. NIO explained in its 2020 Form 20-F that "in furtherance of the BaaS, we agreed to provide guarantee to the Battery Asset Company for the default in payment of monthly subscription fees from users." *Id*.

66.    NIO also controlled other key aspects of Weineng's operations. NIO's 2021 Form 20-F states that Weineng does not maintain, service, control, or possess the battery assets it purchases from the Company. Specifically, NIO stated that with respect to the BaaS model, NIO "provide[d] services to the Battery Asset Company including battery packs monitoring, maintenance, upgrade, replacement, IT system support, etc." NIO 2021 Form 20-F at F-21. During Weineng's launch event, Defendant Li further explained that Weineng would "purchase battery packs and entrust NIO to provide battery rental and operation services to its customers."[21] *See* BaaS Launch Event at 33:25.

67.    Even more fundamentally, Weineng does not get to choose which battery assets or how many battery assets it should purchase from NIO for its inventory. This is all driven by NIO customer demand. *See* NIO Hong Kong Prospectus at 236 (Weineng made "payment to NIO on a monthly basis based on the number of battery packs purchased during the month"); NIO 2021 Form

---

[21] *What the four investors involved in investing in Nio battery asset firm might be thinking about*, CnEVPost (Aug. 21, 2020), https://cnevpost.com/2020/08/21/what-the-four-investors-involved-in-investing-in-nio-battery-asset-firm-might-be-thinking-about/.

20-F at F-20 (NIO sold "battery packs to Wuhan Weineng Battery Asset Co. … on a back-to-back basis when the Group sells the vehicle to the BaaS users and the BaaS users subscribe for the usage of the battery packs.").[22] Thus, NIO could overextend Weineng against Weineng's own best interests if it benefited the Company. Furthermore, during the Relevant Period, Weineng did not produce any products or intellectual property; nor did it maintain its own independent sales force to sell batteries to potential customers. This too was all done by NIO.[23]

68.     As noted *supra*, NIO also maintains physical control of the batteries Weineng purchased by retaining responsibility for storage, maintenance, servicing, charging, and distributing the batteries alongside NIO-owned batteries. *See* NIO Hong Kong Prospectus at 235 ("Both BaaS users and non-BaaS users [were] able to enjoy battery swapping services at the Power Swap stations owned and operated by us…. The 'depleted' batteries swapped out of users' vehicles will be kept physically in the Power Swap station to be charged until they are swapped on to another vehicle…. [*D*]*uring the period when this particular battery pack remains in the Power Swap station as part of our spare batteries pool, its title is deemed to be held by our Company*. After completing battery swaps, the charged batteries swapped on to BaaS users' vehicles are deemed to be owned by the Battery Asset Company, while those swapped on to non-BaaS users' vehicles are deemed to be owned by the respective users themselves.").

---

[22] NIO reiterated this in its letter to the SEC in October 2022. *See* NIO Inc., Letter from NIO Inc. to the Securities and Exchange Commission (Oct. 21, 2022), *available at* https://ir.nio.com/static-files/7d5b261f-a18b-4055-ae75-c5e5a50d495b ("The Company respectfully submits that the Group only sells battery packs to Wuhan Weineng Battery Assets Co. Ltd….on a back-to-back basis when the Group sells the vehicle (without battery pack) to the BaaS users. Therefore, there has been no sales of battery packs to the Battery Asset Company outside of the individual sale of a vehicle (without battery pack)").

[23] *What the four investors involved in investing in Nio battery asset firm might be thinking about*, *supra* n.22 ("[a]s an asset management company whose main business is batteries, Wuhan Weineng will not only be limited to a physical business but more like a 'finance-like' company"); *see also Is Nio's battery swap mode commercially viable?*, CnEVPost (Aug. 25, 2020), https://cntechpost.com/2020/08/25/is-nios-battery-swap-mode-commercially-viable/.

69.    Indeed, NIO-owned batteries and Weineng-owned batteries are comingled, and NIO does not differentiate between them. All the batteries are accessible to NIO vehicle and battery owners, including those who have no relationship with Weineng. NIO and Weineng treat the "Weineng-owned" batteries exactly the same as the NIO-owned batteries, further demonstrating how inextricably linked NIO and Weineng were and how NIO was running Weineng. Thus, the very core of Weineng's business, including pricing, customer relationships, and inventory management, was completely under NIO's control, undermining any claim that Weineng was truly independent from NIO.

70.    To ensure that Weineng maintained its singular focus on serving NIO's interests, Defendants also installed at Weineng several senior managers who also worked at NIO and/or Wuhan Weilai, NIO's subsidiary. These overlapping senior managers included, but were not limited to, Ronghua Lu, Fei Shen, Xue Tingting, and Lihong Qin – about 10% of Weineng's 40-person workforce.

71.    Lu served as both Weineng's General Manager and Director, a director at Wuhan Weilai,[24] and as Battery Operation Supervisor at NIO's subsidiary "Shanghai NIO." Lu, who was responsible for the battery business in both companies, would later reiterate in a March 20, 2022 interview with "ESCI KSP" that NIO always had designs to form a battery asset company like Weineng to support the Company's business model. Lu further acknowledged that NIO was behind the founding of Weineng and hand selected the other investors in the entity:

> Lu: The BaaS that everyone sees today originated from the idea of vehicle-electric separation and battery rental at the beginning of NIO's birth. ***It took NIO five years from its establishment to the official launch of BaaS. I joined Weilai in 2016 and was mainly responsible for this part.***

---

[24]    *See What Grizzly Research got right about NIO*, SINA Finance (Jul. 7, 2022), https://finance.sina.com.cn/tech/csj/2022-07-07/doc-imizmscv0422812.shtml.

*During the whole process of launching BaaS, we found that we needed to establish a battery asset company independent of NIO. Therefore, NIO, as a very important shareholder, has also introduced other strategic investors, so I will naturally have new ideas… Although I am responsible for the battery business in both companies, they are actually different.* As an asset company, Weineng focuses more on asset operation. Our mission is to manage batteries efficiently and make them play more asset value.

Q: Why did it fail to conduct business through financial institutions at that time?

Lu: As far as equity investment institutions are more willing to try new things, institutions tend to be conservative. There was no such model on the market at the time, so organizations had great concerns about developing this business. *By 2020, we will adjust our way of thinking, and simply set up an organization to hold and manage battery assets, and then use it to connect organizations to get money*.

72.    The Weineng Prospectus states that Lu was in charge of battery, data operations, and strategy development at Weilai Energy. Weineng Prospectus at 78. In February 2021, Lu also incorporated a consulting entity that appears to be an affiliate of Weineng, Wuhan Qianlong Wuyong Management Consulting Co Ltd ("Wuhan Qianlong").[25] Lu remains a director and shareholder of Wuhan Qianlong alongside Weineng's reported current Chief Operating Officer, Xue Tingting. In addition, "Qianlong Wuyong is controlled by NIO" and "the executor is Lu Ronghua."[26] Tingting Xue "serv[es] as a shareholder" of Qianlong Wuyong.[27]

73.    Shen served as Weineng's Chairman and Legal Representative while also serving as Vice President of Wuhan Weilai – a position he held since November 2015.[28]

74.    Xue Tingting is Weineng's Chief Operating Officer. Weineng's Prospectus describes Xue as a former manager with Lu in the data, operations, and strategy departments of Wuhan Weilai,

---

[25] Wuhan Qianlong is apparently a Weineng affiliate company as it is co-located with Weineng in the Donghu New Technology Development Zone in Wuhan and shares a service email address with Weineng.

[26] *Weineng, an overlooked mobile mine*, EET China (Jan. 3, 2023), *available at* https://www.eet-china.com/mp/a187169.html.

[27] *See* https://wx.qixin007.com/shareholder/e8969be5a9b7e5bbb7/2df19b63-7a4f-4059-8933-79b35295d4ff/.

[28] *Shen Fei, Weilai Vice President, was appointed Chairman of Wuhan Weilan Battery Asset Co., Ltd.*, Jieman (Aug. 20, 2024), https://m.jiemian.com/article/4860207_ttkx.html; *see also* Weineng Prospectus at 78.

the entity that reportedly oversees Weineng's day-to-day operations on behalf of NIO. *See* Weineng Prospectus at 79 (Xue worked in the "Battery and Data Operations and Strategy Department"). Xue also "serv[es] as a shareholder" of Qianlong Wuyong. *See* ¶ 72.

75.    Lihong Qin, a director and President of NIO, is also the legal representative of Weilai Energy.[29]

> **2.    Defendants' Plan Had Its Desired Effect: After Creating Weineng, NIO Began to Report Steadily Increasing Revenues, While Weineng (With NIO's Help) Scrambled for Cash to Fund NIO's Revenue Recognition Scheme**

76.    Defendants' plan to use Weineng as a pawn to dig out of NIO's liquidity crisis worked. After Defendants formed Weineng, NIO's balance sheet saw transformational change that painted an artificially rosy picture of the Company's revenue and business.

77.    Specifically, NIO more than doubled its revenue in Q42020. NIO reported Q42020 revenue of RMB6.64 billion, compared with RMB2.85 billion in Q42019, when it was leasing the batteries itself.[30] Likewise, for FY2021, NIO reported revenue of RMB26.13 billion, in comparison with RMB16.25 billion for FY2020, during eight months of which NIO leased the batteries itself. *See* NIO Form 2021 20-F at 125. For the nine months ended September 30, 2022, NIO had revenue of RMB13 billion, compared to revenues of RMB9.8 billion for the nine months ended September 30, 2021. *See* NIO Q3 2021 Financial Results at 2 (https://ir.nio.com/static-files/f44a7373-aa0d-4b5d-842c-7021f400dd8c). In 2021 alone, Weineng's first full year of operation, NIO recognized over RMB4 billion, or $600,000,000, in revenue from Weineng alone.

---

[29] *See* Xian Ling Shuo, *NIO wholly-owned Wuhan Nio Energy Company*, NetEase (Jan. 10, 2023), *available at* https://www.163.com/dy/article/HQNP6UUN05118IR2.ht.ml.

[30] *See* NIO Q4 2020 Financial Results at 2, *available at* https://ir.nio.com/static-files/72b2a3c4-24c7-492f-8a4e-c4ea9c103350

78. NIO's battery swap stations also grew meteorically after spinning off Weineng. In August 2020, NIO had 143 battery swap stations.[31] By July 2022, NIO had almost eight times as many – nearly 1,100 – battery swap stations.[32] The combination of fundings and revenues that NIO pulled forward via Weineng made this growth possible.

79. At all times relevant, however, Defendants knew that this rosy façade for NIO would only endure if Weineng had the necessary capital to purchase the leased batteries from NIO. Defendants likewise knew that the only way for Weineng to secure the necessary capital to fund operations was through financings, and that if Weineng failed to find the necessary capital, NIO would again be faced with a profound liquidity crisis. Accordingly, Defendants took an active role in helping Weineng secure financing, while also continuing to serve as the gatekeeper of Weineng's investors to ensure Weineng maintained its chief focus on NIO.

80. From August 2020 through December 31, 2020, Weineng bought RMB290 million worth of EV batteries from NIO. On November 17, 2020, NIO reported total revenues of RMB4,526.0 million ($666.6 million) in Q32020 and gross profit of RMB585.8 million ($86.3 million).

81. In December 2020, mere months after receiving RMB800 million at the time of its creation, Weineng had to raise an additional RMB640 million from new investors, one of which was NIO's battery swap station supplier, Shandong Weida Machinery Co., Ltd., to keep pace with purchasing leased batteries from NIO. As noted *supra*, NIO was willing to temporarily and superficially reduce its equity/voting interest to facilitate this round of financing for Weineng while

---

[31] *See* NIO, Inc., *NIO Launches Battery as a Service*, NIO Newsroom (Aug. 20, 2022), https://www.nio.com/news/nio-launches-battery-service.

[32] *See* NIO, Inc., *First NIO Power Swap Station in Germany Officially Opens*, NIO Newsroom (Oct. 14, 2022), https://www.nio.com/blog/first-nio-power-swap-station-germany-officially-opens.

maintaining control over Weineng and ensuring that Weineng's investors had close ties to the Company.

82.    On a March 2, 2021 conference call, Defendant Li stated that NIO secured additional financing for Weineng, and that potential investors in Weineng approached him – not Weineng – to invest in Weineng during Weineng's rounds of financing:

> Regarding the battery asset management company, we have already finished 2 rounds of financing. Right now, we have 8 shareholders, including NIO. We have already raised around RMB1.44 billion. ***Right now, many new investors have approached me and asked whether it's possible for them to invest in the battery asset management company***.

> At the same time, we also secured sufficient credit facilities from the bank for the battery asset management company. As a very important player or a very important role in the Battery as a Service business model, the battery asset company has already secured sufficient cash to support this business model operation.

83.    For FY2021, Weineng bought RMB4.1 billion worth of EV batteries from NIO.[33]

84.    On March 1, 2021, NIO reported total revenues of RMB6,641.1 million ($1,017.8 million or $1 billion) in Q42020 and gross profit of RMB1,141.9 million ($175.0 million).

85.    On April 6, 2021, NIO reported FY2020 total revenues of RMB16,257.9 million ($2,322 million or $2.3 billion), with total revenues from vehicle sales of RMB15,182.5 ($2.168 million or $2.1 billion) and total revenues from other sales of RMB1,075.4 million ($357 million).

86.    On April 29, 2021, NIO reported total revenues of RMB7,982.3 million ($1,218.3 million or $1.2 billion) in Q12021, representing a huge increase of ***481.8%*** from Q12020 and an increase of 20.2% from Q42020. NIO also reported gross profit of RMB1,554.8 million ($237.3 million) in Q12021, representing another huge increase of RMB1,722.3 million (or $2.46 billion) from a gross loss of RMB167.5 million in Q12020 and an increase of 36.2% from Q42020.

---

[33] NIO does not break down by quarter the revenue from batteries sold to Weineng.

87.    In April 2021, Weineng's thirst for cash to fund the purchase of batteries from NIO continued as it raised an additional RMB72 billion—over $10 billion—in equity.

88.    On August 11, 2021, NIO reported total revenues of RMB8,448.0 million ($1,308.4 million or $1.3 billion) in Q22021, representing an increase of *127.2%* from Q22020, and gross profit of RMB1,573.9 million ($243.8 million) in Q22021, representing an increase of *402.7%* from Q22020.

89.    In August 2021, for the fourth time in its first year of operations, Weineng again needed financing to fund the purchase of NIO batteries. This time, Weineng raised RMB530 million – with over half this amount (RMB270 million) coming from NIO itself. According to NIO, "A few more financial investors invested in the Battery Asset Company, and Guotai … exited." NIO Hong Kong Prospectus at 252. After the August 2021 round of financing, NIO separated itself from the original co-investors and became the sole largest shareholder of Weineng, increasing its equity stake in Weineng to 19.84% – a carefully calculated fraction under the 20% threshold for a presumption that NIO significantly controlled Weineng, which is a factor militating strongly in favor of finding Weineng to be a VIE. *See supra* ¶¶ 56, 224.

90.    On November 9, 2021, NIO reported total revenues of RMB9,805.3 million ($1,521.8 million or $1.5 billion) in Q32021, representing an increase of *116.6%* from Q32020 and an increase of 16.1% from Q22021. NIO also reported gross profit of RMB1,993.2 million ($309.3 million) in 3Q21, representing an increase of *240.3%* from Q32020 and an increase of 26.6% from Q22021.

91.    On April 19, 2022, Weineng issued RMB400 million ($62.62 million) in ABNs (Asset Backed Medium-term Notes) in China's interbank market, raising money to fund operations for the

fifth time. In this note offering, Weineng put up 19,000 of its NIO BaaS contracts as collateral, further demonstrating that Weineng's only business was with NIO.[34]

92.    In the prospectus for this April 2022 offering, NIO was appointed through Wuhan Weilai as "asset service organization 2." *See* Weineng Prospectus at 209 ("[i]n order to facilitate the realization of the trust purpose, the trustee entrusts Wuhan Weineng and Weilai Finance to jointly serve as the asset service provider"); *see also id*. at 42 ("the trustee signed the 'Service Contract' with Wuhan Weineng and Weilai Finance, and appointed Wuhan Weineng and Weilai Financial … as the service agency of the issuance carrier, providing management services related to the underlying assets").

93.    News articles highlighted that Weineng's April 2022 offering utilized NIO's battery contracts as collateral.[35]

94.    On March 24, 2022, NIO reported total revenue of RMB36,136.4 million ($5,670.6 million or $5.6 billion) for FY21, representing an increase of *122.3%* from the previous year. NIO also reported gross profit of RMB6,821.4 million ($1,070.4 million or $1 billion) for FY2021 representing an increase of *264.1%* from the previous year. Thus, during the first full year of pulling in all battery sale revenue through Weineng, NIO had more than doubled its revenues and increased its earnings by a multiple of more than 2.5.

---

[34] *See* Phate Zhang, *NIO's battery asset operator raises $62.62 million through ABN offering*, CnEVPost (Apr. 19, 2022), https://cnevpost.com/2022/04/19/nios-battery-asset-operator-raises-62-62-million-through-abn-offering.

[35] *See Asian Bank of the Year: CICC*, International Financing Review (2022), *available at* https://web.archive.org/web/20230330042821/https://www.ifre.com/story/3697417/asian-bank-of-the-year-cicc-mc5bxjj2vr (archived at Wayback Machine) ("[t]he Mirattery [Weineng] 2022-1 Green Battery ABN raised Rmb400m in the first ABS transaction to use NEV batteries as the underlying assets").

95.     In May 2022, in its sixth offering, Weineng raised another RMB635 million ($95 million) in asset backed securities to fund operations, *i.e.,* the purchase of NIO batteries.[36].

96.     On June 9, 2022, NIO reported total revenues were RMB9,910.6 million ($1,563.4 million or $1.5 billion) in Q12022, representing an increase of 24.2% from Q12021. NIO also reported gross profit was RMB1,446.8 million ($228.2 million) in Q12022.

**D.     GAAP Required NIO to Consolidate Weineng's Financials into NIO's Because Weineng Was a NIO VIE, but Defendants Did Not Do So**

**1.     NIO Held a Variable Interest in Weineng During the Relevant Period**

97.     NIO, as well the other three initial Weineng investors, started with a variable interest (or investment) of 25% of Weineng's equity, NIO's equity interest fell to 13.9% in December 2020 and rose back up to 19.84% in August 2021. Regardless, at all relevant times, NIO's true economic interest was always disproportionately greater than the other investors.

98.     NIO concedes the Company had a variable interest in Weineng as it reported its Weineng interest under the equity method of accounting:

(i) Equity method investments

In August 2020, the Group and three other third party investors jointly established the Battery Asset Company. The Group invested RMB200,000 in the Battery Asset Company and held 25% of the Battery Asset Company's equity interests. In December 2020, the Battery Asset Company entered into an agreement with the other third-party investors for a total additional investment of RMB640,000 by those investors. In 2021, the Group further invested RMB270,000 in the Battery Asset Company and upon the consummation of the investment, the Group owns approximately 19.8% equity interests of the Battery Asset Company. ***The Group, as a major shareholder of the Battery Asset Company, is entitled to appoint one out of nine directors in the Battery Asset Company's board of directors and can exercise significant influence over the Battery Asset Company.*** Therefore, the investment in the Battery Asset Company is accounted for using the equity method of accounting.

NIO 2021 Form 20-F at F-32.

---

[36] *See* Phate Zhang, *Nio's battery asset operator raises about $95 million through ABS offering in China*, CnEVPost (May 31, 2022), https://cnevpost.com/2022/05/31/nios-battery-asset-operator-raises-about-95-million-through-abs-offering-in-china/.

99.     At all times relevant, although NIO characterized Weineng as a related party, it did not disclose that Weineng was a VIE requiring consolidation of its financials with NIO.

### 2.      Weineng Is a NIO VIE

100.     Weineng was a VIE throughout the Relevant Period.

101.     Weineng had non-substantive voting interests. In this regard: (1) NIO's economic interests significantly exceeded its voting rights in Weineng, and (2) substantially all of Weineng's activities involved or were conducted on behalf of NIO, including but not limited to the providing, servicing, and when applicable, swapping, of NIO batteries. Weineng also lacked sufficient equity at risk to finance its activities without additional subordinated financial support.

102.     During the Relevant Period, it became evident that NIO's economic interests would, and significantly did, exceed its voting rights in Weineng. For example, as of the end of 2021, after considering amounts due to NIO by Weineng (and not even including NIO's guarantees for the default of monthly fee subscription fees payable due to Weineng), NIO's indicated relative economic interest in Weineng as compared to other Weineng investors approximated 55%. This percentage significantly exceeded NIO's equity voting interest of less than 20%:

| *RMB amounts in thousands* | | *12/31/2021* |
|---|---|---|
| Receivables Due to NIO from Weineng | | 1,563,757 |
| Weineng Reported Shareholders' Equity | 2,030,668 | |
| NIO Disclosed Ownership Percentage | *19.8%* | |
| Estimated Equity Interest in Weineng attributable to NIO | | 402,072 |
| Estimated NIO Economic Interest In Weineng[37] | | 1,965,829 |
| Total Indicated Interests Held by Equity Interest Holders | | 3,594,425 |
| NIO's Indicated Relative Economic Interest | | *54.7%* |

---

[37] This figure excludes NIO's guarantee to Weineng. The 54.7% figure includes NIO's equity investment and RMB1.5 billion in accounts receivable and is compared to the economic interest of the other equity interest holders in Weineng.

NIO 2021 Form 20-F at F-52 through F-54; January 19, 2023
Weineng Credit Report at 4, 9.

103.    Moreover, as detailed *supra*, substantially all of Weineng's activities involved or were conducted on behalf of NIO. NIO orchestrated Weineng to benefit NIO, NIO substantially ran Weineng's business through Wuhan Weilai – with several overlapping senior managers and directors – and Weineng's one revenue stream, the BaaS subscription revenue, was from NIO. NIO also helped raise money for Weineng and guaranteed to Weineng the default in monthly payments from any user of the BaaS subscriptions – Weineng's one revenue stream.

104.    Weineng was also a VIE because it was thinly capitalized. Weineng lacked sufficient equity at risk to finance its activities without additional subordinated financial support, which generally refers to variable interest that absorbs some or all of an entity's expected losses (*e.g.*, guarantees, equity interests, commitments to fund losses). With NIO's help, Weineng raised money six times during the Relevant Period.[38] *See supra* ¶¶ 92-93, 95. In addition, Weineng had a 0.36 asset to liability ratio as of December 31, 2021 – indicating an inability to pay its current debts when due and an urgent need for cash. *See* ¶¶ 107-112.

105.    NIO also guaranteed portions of Weineng's customer payment obligations and was intricately involved through contractual terms and conditions in the servicing of batteries purportedly sold to Weineng. This is important considering that certain of Weineng's debt arrangements were, in part, collateralized by the underlying customer contracts being serviced and fulfilled by NIO.

---

[38] While it appears that Weineng was able to obtain financing as of September 30, 2022 and December 31, 2021, Weineng's ability to obtain additional financing on reasonable terms was highly uncertain, absent NIO, given that one of Weineng's primary collateralizing assets was BaaS contracts underlying NIO batteries, as fulfilled by NIO. *See* ¶¶ 92-93. The April 2022 Weineng Prospectus is apparently the only one publicly available.

### 3. NIO Was Weineng's Primary Beneficiary and Therefore Had to Be Consolidated

106.    NIO was the primary beneficiary of Weineng. First, through its variable interests, NIO had the obligation to absorb potentially significant losses of the entity, or the right to receive potentially significant benefits from the entity. *See supra* ¶¶ 100-105. Second, as reflected in significant part above through NIO's close involvement in both the VIE's operations and financing activities – including running Weineng's businesses, installing numerous overlapping senior managers, and assisting Weineng in securing financing – NIO had the power to direct the entity's activities that most significantly impact Weineng's economic performance. *See supra* ¶¶ 63-70, 71-75, 92-93. Accordingly, GAAP required NIO to consolidate Weineng – NIO, however, did not.

### E. GAAP Required NIO to Only Recognize Revenue From Weineng That Was Probable of Collection, but Defendants Caused NIO to Recognize Millions of Weineng Revenue That Was Uncollectible Under GAAP Anyway

107.    Even if one were to improperly conclude that consolidation of Weineng as a VIE was not necessary, NIO still recognized millions of dollars of revenue from battery sales contracts with Weineng that were not probable of collection in violation of GAAP.

108.    In NIO's 2021 Form 20-F, the Company stated that it recognized all the revenue from selling batteries to Weineng upon delivery of the vehicle: "[NIO] recognizes revenue from the sales of battery packs to the Battery Asset Company ***when the vehicles (together with the battery packs) are delivered to the BaaS users*** which is the point considered then the control of the battery packs is transferred to the Battery Asset Company." NIO 2021 Form 20-F at F-20.

109.    NIO disclosed the following amounts due from Weineng in the Company's 2021 Form 20-F:

|                                          | Year Ended December 31, | |
| Amounts in RMB and thousands | **2021** | **2020** |
| Sales of goods | 4,138,187 | 290,135 |
| Service income | 56,095 | 38 |
| Sale of raw material, property and equip | - | 120 |
| Amount due from Weineng | 1,563,757 | 118,779 |

NIO 2021 Form 20-F at F-51, 52.

110.    NIO's reported revenue from asserted battery sales to Weineng were not probable of collection to support recognition under ASC 606 because Weineng's financial condition raised significant doubts about Weineng's ability to pay amounts due to NIO as of December 31, 2021. Weineng reported working capital of ***negative RMB1.658 billion*** as of December 31, 2021. *See* Weineng Credit Report at 4. Weineng's financial information as of December 31, 2021 reflected current assets totaling RMB929.7 million. *Id*. Only RMB380.3 million of this amount pertained to cash and other financial assets held for trading. *Id*. at 20. Conversely, including amounts due to NIO, Weineng reported current liabilities of RMB2.59 billion in current liabilities. *See id*. at 21.

111.    Thus, Weineng had an asset to liability, or current, ratio of only ***0.36*** as of December 31, 2021. The current ratio compares all of a company's current assets to its current liabilities.[39] As of September 30, 2022, Weineng's current ratio worsened slightly to ***0.34***. This means for every $34 in assets (cash, receivables, inventory, etc.) Weineng had, it also had $100 in liabilities (accounts payable, debt, wages, etc.), reflecting its inability to pay current debts due within one year, including those amounts due to NIO (without obtaining additional financial support). *Id.*

---

[39] *See generally* Jason Fernando, *Current Ratio Explained With Formula and Examples*, Investopedia (May 17, 2025), https://www.investopedia.com/terms/c/currentratio.asp#toc-formula-and-calculation-for-the-current-ratio ("The current ratio measures a company's ability to pay current, or short-term, liabilities (debts and payables) with its current, or short-term, assets, such as cash, inventory, and receivables. In many cases, a company with a current ratio of less than 1.00 does not have the capital on hand to meet its short-term obligations if they were all due at once, while a current ratio greater than 1.00 indicates that the company has the financial resources to remain solvent in the short term.").

112.    Weineng's lack of working capital, insufficient available cash balance, and low credit rating do not support NIO's implied assertion that amounts receivable from Weineng were probable of collection.

**F.    The Truth Is Slowly Revealed: Grizzly Releases Its Report**

113.    On June 28, 2022, Grizzly Research LLC published the Grizzly Report entitled "We Believe NIO Plays Valeant-esque Accounting Games to Inflate Revenue and Boost Net Income Margins to Meet Targets." The Grizzly Report revealed to investors that Weineng was largely a NIO front that NIO used to artificially boost its revenues and income. The Grizzly Report stated, in relevant part, as follows:

> We have discovered that NIO has used Wuhan Weineng, an unconsolidated related party entity, to inflate its revenues and boost margins… ***We define revenue that has been "pulled-forward" as any revenue beyond what NIO would have received in the first year of subscriptions had it consolidated Weineng as a subsidiary….*** NIO's financials have been overstated through a scheme using an unconsolidated, related party…. Since Weineng Battery was formed in August 2020, NIO has found it to be a reliable and growing stream of revenue. In just four months of operating in 2020, NIO generated 290 million RMB from sales to Weineng. Despite this quick start, revenue attributable to the entity ballooned even further in 2021 to 4.14 billion RMB representing ~11% of overall 2021 revenue. The arrangement between Weineng and NIO has…[p]ull[ed] forward several years of revenue to help meet ambitious estimates [and] [s]hift[ed] depreciation costs off [NIO's] financial statements.

114.    After this news, NIO's ADSs closed at $22.36, down 2.5% from the previous day's close of $22.95. Defendants mitigated the harm caused by the Grizzly Report by quickly calling it meritless in a statement issued at 8:00 PM EST[40] that same day:

> The report is without merit and contains numerous errors, unsupported speculations and misleading conclusions and interpretations regarding information relating to the Company. The Company's board of directors, including the audit committee, is reviewing the allegations and considering the appropriate course of action to protect the interests of all shareholders. The Company will make additional disclosures in due course consistent with the requirements of applicable rules and regulations of the Securities and Exchange Commission, the New York Stock Exchange, The Stock Exchange of Hong Kong Limited (the "SEHK") and the Singapore Exchange

---

[40] All times are given in U.S. Eastern time.

Securities Trading Limited (the "SGX-ST"). The Company emphasizes its continued and unwavering commitment to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with applicable rules and regulations.

115.    Four hours later, at approximately 12:30 AM on June 29, 2022, NIO issued a press release again denying the Grizzly Report's allegations in conclusory fashion. Again, there was no substantive rebuttal of the Grizzly Report. On this news, in pre-market/post-market trading between 8:00 PM on June 28, 2022 and 6:00 AM on June 29, 2022, NIO's ADS price fell from $22.34 to $20.38. NIO's ADSs closed on June 29, 2022 at $21.86 per share.

116.    Additionally, between market close on June 27, 2022 and market close on June 28, 2022, the price of the Company's shares on the Hong Kong stock exchange fell $21.20, or 11%, to close at $165.50 per share on June 28, 2022.

**G.    NIO Is Forced to Acknowledge the Seriousness of the Report's Allegations and Creates an "Independent" Committee to Investigate; NIO's ADSs Fall Almost 9%**

117.    On July 11, 2022, NIO shocked the market by announcing that it had formed a special committee to oversee an investigation into the Grizzly Report's allegations – which NIO hastily claimed were all meritless on the date the Grizzly Report was issued:

> Following its previous statement in response to the allegations made in a report issued by…Grizzly Research LLC on June 28, 2022… the Company's board of directors (the "Board"), including the audit committee of the Board, after having reviewed the allegations, at the recommendation of the management of the Company and in order to protect the interests of all shareholders, has decided to form an independent committee (the "Independent Committee"), consisting of independent directors Mr. Denny Ting Bun Lee, Mr. Hai Wu, and Ms. Yu Long, to oversee an independent investigation regarding the allegations made in the…Report (the "Independent Investigation"). The Independent Committee has retained independent professional advisors to assist with the Independent Investigation, including an international law firm and a well-regarded forensic accounting firm. The Company will provide updates on the Independent Investigation in due course consistent with the requirements of applicable rules and regulations of the Securities and Exchange Commission, the New York Stock Exchange, The Stock Exchange of Hong Kong Limited (the "SEHK") and the Singapore Exchange Securities Trading Limited (the "SGX-ST"). The Company reiterates its continued and unwavering commitment to maintaining high standards of

corporate governance and internal control, as well as transparent and timely disclosure in compliance with applicable rules and regulations.

118.    On this news, the Company's ADSs fell $2.03, or 8.9%, to close at $20.57 per share on July 11, 2022, on unusually heavy trading volume.

### H.    NIO's Internal Investigation into the Grizzly Report's Allegations Was Tainted From the Start

119.    The Committee tasked with investigating the allegations made in the Grizzly Report was supposed to be independent, but it was not. In fact, the majority of the Committee members, Wu and Long, had pre-existing and close personal relationships with Defendant Li.

120.    According to NIO's website, Wu served as an executive director of China at Temasek Holdings Advisors (Beijing) Co., Ltd before joining NIO's Board in July 2016.[41] During his tenure at Temasek, Wu's company was the lead investor in the then-private company, NIO, helping it raise $316M in funding in July 2016.[42]

121.    Likewise, Defendant Li and Yu Long both sit on the board of Shenzhen Zhiling Technology Co. Ltd.[43] Defendant Li is the actual controller of the company. Additionally, Defendant Li registered a NIO car (number: 0003) for Yu Long's 11-year-old daughter in June 2017.[44] Yu Long also rang the opening bell with Defendant Li to celebrate the listing of NIO on the NYSE.[45]

---

[41] NIO, Inc., *Board of Directors*, https://ir.nio.com/governance/board-of-directors.

[42] *See Series B – NIO*, Crunchbase, https://www.crunchbase.com/funding_round/nextev-series-b--87560d64; *see also Li Bin of NIO: A college student from a mountain village, an entrepreneur in the tide of innovation*, Sina (Dec. 14. 2018), https://tech.sina.com.cn/it/2018-12-14/doc-ihqackac8088086.shtml.

[43] *See* https://www.qcc.com/firm/fa98e98e432b5ecb265e4dd836e408e1.html.

[44] Li Qin, *Careerist Li Bin: A 100-billion trader in the electric vehicle industry and a left-behind boy*, Titanium Media (Dec. 18, 2017), *available at*: http://finance.sina.com.cn/chanjing/gsnews/2017-12-18/doc-ifyptkyk5132159.shtml.

[45] Captain Jack, *What's it like to ring the bell at the NYSE? Hear what these 12 ES8 owners have to say* (Sept. 12, 2018), *available at* https://app.nio.com/app/web/v2/content/1964808082?_viewBeginTop=true&load_js_bridge=true&show_navigator=false&content_type=article&content_id=1964808082.

122.    Given that two of the three Committee members had long-standing relationships with Defendant Li, the Committee was conflicted from the start and its findings (which were, regardless, wholly conclusory and incomplete (*see infra* ¶¶ 123-124)), were meaningless. If anything, the conflicted Committee and the complete lack of explanation as to why Grizzly was wrong only further highlight Defendants' misconduct.

## I.    Post-Relevant Period Developments

### 1.    NIO Announces That the Committee's Investigation Is Nearly Complete and Claims That Grizzly's Allegations Were Not Substantiated – Again Without Providing One Fact in Rebuttal

123.    On August 26, 2022, before the market opened, NIO filed a press release explaining that the supposedly independent Committee's investigation into the Grizzly Report was nearly (but not entirely) completed:

> [A]n update on the status of the previously announced independent internal review. As previously disclosed, shortly after the publication of a report issued by…Grizzly Research LLC…an independent committee…was formed to oversee an independent internal review regarding the key allegations made in the [Grizzly Report]. The Internal Review was performed by the Independent Committee with the assistance of third-party professional advisors including an international law firm and forensic accounting experts from a well-regarded forensic accounting firm that is not the Company's auditor. The Internal Review is now substantially complete. Based on findings of the Internal Review, the Independent Committee has concluded that these allegations were not substantiated.

124.    After announcing that the investigation was "substantially complete," NIO has not since announced its completion.

125.    The market was unconvinced by the reported results of the Committee's purportedly nearly-complete investigation. After the August 26, 2022 press release, NIO's ADSs fell from a $20.77 opening price to close at $19.92, a drop of over 4%.

126.    This was the third time NIO nonchalantly addressed Grizzly's findings without even attempting to debunk any specific factual allegations in the Grizzly Report. It is telling that NIO repeated this tactic – on June 28, on July 11, and again on August 26, 2022.

**J.      After NIO Superficially Denied the Grizzly Report's Detailed Allegations, the SEC Asked NIO for an Explanation of its Accounting**

127.    On September 22, 2022, less than one month after its conclusory announcement that the Grizzly Report was unsubstantiated, the SEC wrote to Defendant Feng requesting more information relating to NIO's VIE analysis for Weineng:

> We note your 19.8% equity interest in the Battery Asset Company which your account for under the equity method. Please provide us your analysis as to whether Battery Asset Company is a variable interest entity (VIE), pursuant to ASC 810-10-15-14. Include in your response the following: 1. An explanation of the design and purpose of Battery Asset Company; 2. The identity of the other shareholders of Battery Asset Company, and a description of the related party relationships; 3. Your consideration as to whether your guarantee for the default of monthly fee subscription fees or other implicit guarantee was designed to protect equity holders from absorbing expected losses; and 4. To the extent Battery Asset Company is a VIE, provide us your analysis as to the determination of the primary beneficiary (ASC 810-10-25-38A) and consideration for disclosures (ASC 810-10-50).

128.    The September 22, 2022 SEC letter also noted that "we remind you that the company and its management are responsible for the accuracy and adequacy of their disclosures, notwithstanding any review, comments, action or absence of action by the staff."

**K.      NIO Responds to the SEC – Skimming the Surface and Not Providing a Full Picture of the VIE Accounting Issues**

129.    On October 21, 2022, Defendant Feng responded to the SEC. NIO parroted the VIE GAAP regulation (ASC 810) and conclusively stated that "[a]ccording to the articles of incorporation of the Battery Asset Company, each shareholder's obligation to absorb the expected losses and rights to expected residual returns of the Battery Asset Company are in proportion to the respective shareholder's equity interest."

130.    NIO, however, was careful not to mention to the SEC that Weineng owed NIO $225 million, or approximately RMB1.5 billion, as of December 31, 2021 – when NIO's equity interest in Weineng was worth only $75 million, or approximately RMB500 million. Nor did NIO mention that the Company's economic stake in Weineng was 55% when its equity/voting rights were only 19.84% – a highly relevant fact in applying ASC 810. NIO also stated that "based on the design of purpose of [Weineng's] business, [its] activities are self-driven instead of being conducted on behalf of any investor." In sum, NIO did not provide the SEC with the full story, omitting that NIO was the only Weineng investor with an entire segment of its business dependent on Weineng.

131.    Feng's response to the SEC also stated that Weineng had, as of December 31, 2021, "received equity investment from its shareholders totaling RMB1.97 billion, which accounts for a significant portion of the total assets of the Battery Asset Company," but this figure only referred to Weineng as of ***December 31, 2021*** – ignoring the fact that Weineng was thinly capitalized during FY2021. In addition, the very fact that Weineng had to go seek financing four times in one year – at times with NIO's help, using NIO's BaaS contracts as collateral (*see supra* ¶¶ 91-93), and two more times (*see supra* ¶¶ 91, 95) after December 31, 2021 – underscores the precariousness of Weineng's financial situation and its ability to pay its current debts.

132.    The SEC has not yet taken further action against NIO.[46]

---

[46] The SEC's failure to take further action against NIO is not significant. The SEC has limited resources and has often not taken further action where fraud was later revealed. The case of Bernard Madoff is an infamous example. *See In re G.K. Scott & Co.*, 51 S.E.C. 961, 966 n.21 (1994) ("A regulatory authority's failure to take early action neither operates as an estoppel against later action nor cures a violation") (internal quotation omitted); *Union Pac. R.R. Co. v. Chi. & N.W. Ry. Co.*, 226 F. Supp 400, 406 (D.C. Ill. 1964) ("[I]f private suits were barred in cases where the SEC chose not to sue, the private right would have an exceedingly limited utility…. The practicalities of administration in a government agency forbid giving conclusive significance to SEC inaction. A lack of information or limitations of time, manpower, and resources will often dictate the decision not to sue. The fact that an interested and capable private party stands ready to commence judicial proceedings may itself diminish the need for public action").

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.    August 11, 2020 Q2 2020 Financial Results and Conference Call

133.    On August 11, 2020, the first day of the Relevant Period, NIO held a conference call with analysts in which they discussed the formation of Weineng. During the conference call, an analyst asked Defendant Li about whether Weineng would "ease [] pressure on [NIO's] balance sheet". Defendant Li obfuscated the issue, but ultimately misrepresented that Weineng would not affect NIO's balance sheet:

Ming-Hsun Lee – BofA Merrill Lynch, Research Division – Research Analyst:

First off, I would like – I want to know that right now, how much of battery assets on your book? And once you set up a new factory management – asset management company, around how much asset you can reduce from your balance sheet? This can ease your pressure on balance sheet going forward. And also, the second question is that once the BaaS business model is confirmed, then I believe you can start over an auto finance program for both the vehicle as well as the battery. So I think that the down payment for consumers will be much lower compared to the previous stages. So how much more new demand do you think you can create through Battery-as-a-Service, right? So that's my first question.

Defendant Li:

I would like to explain a little bit about the difference. Right now, if the user wants to do the financing for the batteries, then it means that at the beginning of the vehicle purchase, they can pay less money, that is around RMB100,000 less. Then they will have the monthly payment, but for that monthly payment, they cannot get the loan. So it means that we can use the ES6 as an example. The price is around RMB358,000. Then it means that the users can pay RMB258,000 at the beginning, but for this, they cannot get the loan from the bank because of the government policy restrictions.

But if we can go with the BaaS solution, then it means that with the new product homologation policy and the certification policy, the users can have less payment at the beginning, but they can still enjoy the loan for their monthly payment, which, just like you mentioned, should be able to lower the down payment as well as the monthly payment for the users…. We are now at the final commercial preparation stage. A very important task for us is to prepare the setup of the battery asset management company. ***We are 1 party out of this endeavor, but we are not the main stakeholder. So it means that it's not going to affect our balance sheet. But we would like to set up this company around August. This asset company is going to own the battery assets and then lease it to the users.***

134.    The bolded statements were materially false and misleading and omitted material facts when made because Defendant Li knew but did not disclose to investors that:

(a)    The chief purpose for which NIO created Weineng was to materially "affect" NIO's balance sheet, *i.e.,* by creating an end run around GAAP that would improperly allow NIO to recognize the full sale price of leased batteries immediately and to remove the depreciation of leased batteries from NIO's books. *See* ¶¶ 52, 53, 57, 59-61, 77.

(b)    NIO was not merely "1 party of this endeavor" – it was the driving force behind Weineng, and Weineng's only source of revenue. NIO orchestrated Weineng to benefit itself and materially pull forward revenue. The success of Weineng was dependent on NIO and vice versa. No other Weineng investor was similarly situated. *See* ¶¶ 52-57, 59-61.

(c)    Weineng was set up with NIO as its primary beneficiary. *See* ¶¶ 52-61, 62, 106.

(d)    Weineng was set up with NIO having the controlling financial interest. *See* ¶¶ 62-75, 100-105.

(e)    Weineng was designed as a NIO VIE. *See* ¶¶ 52-55, 97, 100-105.

**B.    August 31, 2020 Prospectus**

135.    On August 31, 2020, NIO filed with the SEC a prospectus pursuant to Rule 424(b)(5). The prospectus was filed in connection with the issuance of 88,500,000 ADSs of NIO, each representing one Class A ordinary share of NIO, at $17 per ADS. The prospectus was filed pursuant to a June 9, 2020 Registration Statement signed by Individual Defendants Li and Feng, as well as NIO directors Qin, Wu, Lee, and Mitchell. That prospectus provided, in relevant part, that:

Under the BaaS model, we sell a battery pack to the Battery Asset Company, and the user leases the battery from the Battery Asset Company. The service we provide to our users under the BaaS model relies, in part, on the smooth operation of and stability and quality of service delivered by the Battery Asset Company, which we cannot guarantee. ***We invested in the Battery Asset Company together with three BaaS Partners, and we only have limited control over its business operations. If the Battery Asset Company fails in providing high-quality services to our users, we will suffer from negative customer reviews and even returns of products or services. If the Battery Asset Company is unable to obtain future financings from the BaaS Partners or other third parties to meet its operational needs, it may not be able to continue purchasing batteries from us and leasing them to our users, or otherwise maintain its healthy and sustainable operations.*** On the other hand, if the Battery

Asset Company bears a significant rate of customer default on its payment obligations, its results of operations and financial performance may be materially impacted, which will in turn reduce the value of our and the BaaS Partners' investments in the Battery Asset Company. (424B5 at S-18).

136.    The bolded statements were materially false and misleading and omitted material facts when made because Defendants knew but did not disclose to investors that:

(a)    NIO was not on equal footing with the "three Baas Partners" involved in Weineng. NIO was the driving force behind Weineng, and Weineng's only source of revenue during the Relevant Period. NIO orchestrated Weineng to benefit itself by materially pulling forward its revenue. Weineng's success was dependent on NIO, and vice versa. No other Weineng investor was similarly situated. *See* ¶¶ 52-57, 59-60, 77-78.

(b)    NIO did not merely have "limited control" over Weineng. NIO had singular and significant control over the entity. NIO ran Weineng's business from top to bottom (¶¶ 62-69), installed overlapping senior managers and directors at Weineng (¶¶ 70-74), actively assisted Weineng in obtaining financing to fund its operations, *i.e.,* the purchase of leased batteries from NIO (¶¶ 80, 82-83, 9), and even provided a guarantee to Weineng for the default in payment of monthly subscription fees (¶¶ 65, 103, 105). Weineng's business was completely dependent on NIO. *See* ¶¶ 62-69. No other Weineng investor was similarly situated. *See* ¶¶ 52-60.

(c)    Weineng did not actually provide meaningful "services" to NIO's users. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 62-69.

(d)    Weineng was severely undercapitalized and would necessarily have to continually raise money to stay in business. Given that Weineng was needed to support NIO's revenue recognition scheme during the Relevant Period, NIO was uniquely responsible for helping to secure financing for Weineng. NIO even bore the risk of user defaults in monthly payments. *See* ¶¶ 65, 79-83, 87, 89, 91, 92, 103-105.

(e)    There was a serious risk relating to NIO not disclosing Weineng as a VIE under GAAP, as it should have, and wrongfully recognizing all of Weineng's battery sales revenue immediately. *See* ¶¶ 77, 84-86, 88, 90, 94, 96.

(f)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(g)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(h)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

46

**C.    November 17, 2020 Q3 2020 Financial Results and November 18, 2020 Conference Call**

137.    On November 17, 2020, NIO issued a press release with its Q32020 financial results and held its third quarter conference call. In the press release, which was also filed as a Form 6-K and signed by Defendant Feng, NIO reported as follows:

> Total revenues were RMB4,526.0 million ($666.6 million) in the third quarter of 2020, representing an increase of 146.4% from the third quarter of 2019 and an increase of 21.7% from the second quarter of 2020.

> Gross profit was RMB585.8 million ($86.3 million) in the third quarter of 2020, representing an increase of RMB807.4 million from a gross loss of RMB221.6 million in the third quarter of 2019 and an increase of RMB272.7 million from the second quarter of 2020.

138.    These statements were materially false and misleading and omitted material facts when made because Defendants knew that:

(a)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(b)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

(d)    NIO improperly included in its financial figures the full price for leased batteries sold to Weineng during Q32020. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 52, 56-57, 76, 77, 78, 80, 97-106.

(e)    NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id*.

(f)    NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 52, 53, 59-61, 79, 80, 97-106.

139.    On the November 18, 2020 conference call, in which Defendant Li participated, Defendant Fang reiterated the same reported revenues as ¶ 137. These statements were materially false and misleading and omitted material facts when made for the reasons given in ¶ 138.

140.    On December 10, 2020, NIO filed a Form 6-K with the SEC, signed by Defendant Feng. This document reported NIO's unaudited financial results for the nine months ending September 3, 2020. This report disclosed numerous entities that were NIO VIEs:

| VIE and VII.'s subsidiaries | Economic interest held | Place and Date of incorporation or date of acquisition |
|---|---|---|
| Prime Hubs Limited ("Prime Hubs") | 100% | BVI, October 2014 |
| NIO Technology Co., Ltd. ("NIO SHTECH") (formerly 1:nown as Shanghai NextEV Technology Co., Ltd.) | 100% | Shanghai, PRC, Noveruber2014 |
| Beijing NIO Network Technology Co., Ltd. ("NIO BJTECH") | 100% | Beijing, PRC, July 2017 |
| Shanghai Anbin Technology Co., Ltd. ("NIO ABTECH") | 100% | Shanghai, PRC, April 2018 |

141.    These statements were materially false and misleading and omitted material facts when made because they misrepresented that this list was a complete list of NIO's VIEs, they failed to disclose that Weineng was a NIO VIE, and they gave the false impression to NIO investors that Weineng was not a VIE. *See* ¶¶ 100-105.

**D.    December 4, 2020 Prospectus**

142.    On December 14, 2020, NIO filed with the SEC a prospectus pursuant to Rule 424(b)(5). The prospectus was filed in connection with the issuance of 68,000,000 ADSs of NIO, each representing one Class A ordinary share of NIO, at $39.00 per ADS. The prospectus was filed pursuant to a June 9, 2020 Registration Statement signed by Defendants Li and Feng, as well as directors Qin, Wu, Lee, and Mitchell. That prospectus provided, in pertinent part:

> Under the BaaS model, we sell a battery pack to the Battery Asset Company, and the user subscribes to the usage of the battery pack from the Battery Asset Company. ***The service we provide to our users under the BaaS model relies, in part, on the smooth operation of and stability and quality of service delivered by the Battery Asset Company, which we cannot guarantee. We invested in the Battery Asset Company together with three BaaS Partners, and we only have limited control over its business operations. If the Battery Asset Company fails in providing high-quality services to our users, we will suffer from negative customer reviews and even returns of products or services. If the Battery Asset parties to meet its operational***

***needs, it may not be able to continue purchasing batteries from us and leasing them to our users***, or otherwise maintain its healthy and sustainable operations….(424B5 at S-19 – S-20)

143.    The bolded statements were materially false and misleading and omitted material facts

when made because Defendants knew but did not disclose to investors that:

(a)    NIO was not on equal footing with the "three Baas Partners" involved in Weineng. NIO was the driving force behind Weineng, and Weineng's only source of revenue during the Relevant Period. NIO orchestrated Weineng to benefit itself by materially pulling forward its revenue. Weineng's success was dependent on NIO, and vice versa. No other Weineng investor was similarly situated. *See* ¶¶ 53-57, 59-60, 77-79.

(b)    Weineng did not actually provide meaningful "services" to NIO's users. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 62-69.

(c)    NIO did not merely have "limited control" over Weineng. NIO had singular and significant control over the entity. NIO ran Weineng's business (¶¶ 62-69), had overlapping senior managers and directors (¶¶ 70-74), assisted Weineng in obtaining financing to fund its operations, i.e. the purchase of batteries from NIO (¶¶ 79, 81-83, 92), and even provided a guarantee to Weineng for the default in payment of monthly subscription fees (¶¶ 65, 105, 105). Weineng's business was completely dependent on NIO. *See* ¶¶ 62-69. No other Weineng investor was similarly situated. *See* ¶¶ 52-60.

(d)    Weineng was undercapitalized and would necessarily have to raise money to stay in business. Given that Weineng was needed to support NIO's revenue recognition scheme during the Relevant Period, NIO was uniquely responsible to secure financing for Weineng. NIO even bore the risk of user defaults in monthly payments. *See* ¶¶ 67, 79-83, 87, 89, 91, 92, 103-105.

(e)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(f)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(g)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

(h)    There was a serious risk relating to NIO not disclosing Weineng as a VIE under GAAP, as it should have, and wrongfully recognizing all of Weineng's battery sales revenue immediately. *See* ¶¶ 77, 84-86, 88, 90, 94, 96.

E.    **March 1, 2021 Q4 2020 Financial Results and March 2, 2021 Conference Call**

144.    On March 1, 2021, NIO issued its Q42020 financial results. In its press release, which was also issued on Form 6-K and signed by Defendant Feng, NIO stated:

> Total revenues were RMB6,641.1 million ($1,017.8 million) in the fourth quarter of 2020, representing an increase of 133.2% from the fourth quarter of 2019 and an increase of 46.7% from the third quarter of 2020.

> Gross profit was RMB1,141.9 million ($175.0 million) in the fourth quarter of 2020, representing an increase of RMB1,395.7 million from a gross loss of RMB253.8 million in the fourth quarter of 2019 and an increase of RMB556.1 million from the third quarter of 2020.

145.    These statements were materially false and misleading and omitted material facts when made because:

(a)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(b)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

(d)    NIO improperly included in its financial figures the full price for leased batteries sold to Weineng during Q42020. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 52, 56-57, 76, 78, 82-84.

(e)    NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id*.

(f)    NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 52, 53, 59-61, 79, 82-84, 97-106.

146.    During NIO's March 2, 2021 conference call, Defendant Feng reiterated the same revenue and gross profit figures as in paragraph 144. These statements were materially false and misleading and omitted material facts when made for the reasons given in paragraph 145.

50

F.     **April 6, 2021 2020 Form 20-F**

147.     On April 6, 2021, NIO filed its annual report for 2020 on Form 20-F, signed by

Defendant Li. That report provided, in pertinent part, as follows:

> For the full year 2020, NIO's total revenues were RMB16,257.9 million. Of this,
> NIO's total revenues from vehicle sales were RMB15,182.5 million and total revenues
> from other sales was RMB1,075.4 million….. (20-F at 99-100, 109)

> Gross profit in 2020 was RMB1,873.4 million (US$287.1 million), representing an
> increase of RMB3,072.2 million from a gross loss of RMB1,198.8 million in 2019.
> *Id.*

148.     These statements were materially false and misleading when made because

Defendants knew but did not disclose to investors that:

(a)     NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(b)     NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c)     Weineng was a NIO VIE. *See* ¶¶ 98-105.

(d)     NIO improperly included in its financial figures the full price for batteries sold
to Weineng during FY2020. GAAP required NIO to consolidate Weineng's
financials into NIO's because it was a VIE. Accordingly, NIO could only
properly recognize revenues on leased batteries as monthly payments were
made to Weineng on the battery subscriptions. NIO could not recognize the
full revenue for the battery sales, *i.e.,* five to six and a half years of revenue,
immediately upon the sale of the batteries to Weineng. *See* ¶¶ 52, 56-57, 76-
78, 85, 97-106.

(e)     NIO's substantial year-over-year profit increase was due in part to the
Company's recognition of the full sale of leased batteries to Weineng
immediately in violation of GAAP. *See id*.

(f)     NIO's gross profit statements failed to account for the depreciation of the
leased batteries, which GAAP accounting required under these circumstances
because Weineng's financials should have been consolidated with NIO's. *See*
¶¶ 52, 53, 59-61, 79, 85, 97-106.

149.    This Form 20-F also provided the following charts reporting NIO's revenues, amounts due from Weineng, and gross profits:[47]

| | **Year Ended December 31,** | | | |
| | **2018** | **2019** | **2020** | |
| **Revenues: (1)** | **RMB** | **RMB** | **RMB** | **US$** |
| Vehicle sales | 4,852,470 | 7,367,113 | 15,182,522 | 2,326,823 |
| Other sales | 98.701 | 457.791 | 1.075.411 | 164.814 |
| **Total revenues** | 4,951.17 | 7,824,904 | 16.257.933 | 2,491,637 |
| **Cost of sales: (2)** | | | | |
| | - | | - | - |
| Vehicle sales | 4,930,135 | -8,096,035 | 13,255,770 | 2,031,536 |
| Other sales | -276,912 | -927,691 | -1,128,744 | -172,988 |
| | | - | - | - |
| **Total cost of sales** | 5,207,047 | -9,023,726 | 14,384,514 | 2,204,524 |
| Gross (loss) profits | -255,876 | -1,198,822 | 1,873,419 | 287,113 |
| Operating expenses:(2) | | | | |
| | - | | | |
| Research and development(2) | 3,997,942 | -4,428,580 | -2,487,770 | -381,267 |
| | | - | | |
| Selling, general and administrative(2) | 5,341,790 | -5,451,787 | -3,932,271 | -602,647 |
| Other operating loss | | | -61,023 | -9,352 |
| | - | | | |
| **Total operating expenses** | 9,339,732 | -9,880,367 | -6,481,064 | -993,266 |
| | - | - | | |
| **Loss from operations** | 9,595,608 | 11,079,189 | -4,607,645 | -706,153 |
| Interest income | 133,384 | 160,279 | 166,904 | 25,579 |
| Interest expenses | -123,643 | -370,536 | -426,015 | -65,290 |
| Share of losses of equity investee | -9,722 | -64,478 | -66,030 | -10,120 |
| Other income (loss), net | -21,346 | 66,160 | -364,928 | -55,928 |
| **Loss before income tax expenses** | **-9,616,935** | **-11,287,764** | **-5,297,714** | **-811,912** |
| Income tax expense | -22,044 | -7,888 | -6,368 | -976 |
| **Net loss** | **-9,638,979** | **-11,295,652** | **-5,304,082** | **-812,888** |

---

[47] NIO defines "other sales" as follows: "Other Sales mainly consist of revenues from sales of our service package and energy package, battery upgrade service, automotive regulatory credits, accessories, and a number of embedded products and services offered together with vehicle sales. Embedded products and services include home chargers, vehicle connectivity service, extended warranty and battery swapping service."

*Revenues*

The following table presents our revenue components by amount and as a percentage of the total revenues for the years indicated.

| | Year Ended December 31, | | | | | | |
| | 2018 | | 2019 | | 2020 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | | | | (in thousands) | | | |
| **Revenues:** | | | | | | | |
| Vehicle sales | 4,852,470 | 98.0 | 7,367,113 | 94.1 | 15,182,522 | 2,326,823 | 93.4 |
| Other sales | 98,701 | 2.0 | 457,791 | 5.9 | 1,075,411 | 164,814 | 6.6 |
| **Total revenues** | 4,951,171 | 100.0 | 7,824,904 | 100.0 | 16,257,933 | 2,491,637 | 100.0 |

(20-F at 100).

*(b) The Group had the following significant related party balances:*

*(i) Amounts due from related parties*

| | As of December 31 | |
| | 2019 | 2020 |
| Wuhan Weineng Battery Assets Co. Ltd. | — | 118,779 |
| Ningbo Meishan Bonded Port Area Weilan Investment Co., Ltd. | 50,000 | 50,000 |
| Kunshan Siwopu Intelligent Equipment Co., Ltd. | — | 617 |
| Nanjing Weibang Transmission Technology Co., Ltd. | 674 | 509 |
| Wistron Info Comm (Kunshan) Co., Ltd. | 109 | — |
| Total | 50,783 | 169,905 |

*(xii) Sales of goods*

| | For the Year Ended December 31, | | |
| | 2018 | 2019 | 2020 |
| Wuhan Weineng Battery Assets Co., Ltd. | — | — | 290,135 |
| Beijing Bit Ep Information Technology Co., Ltd. | — | — | 4,402 |
| Beijing Bitauto Interactive Technology Co., Ltd. | — | — | 1,974 |
| Beijing Yiche Interactive Advertising Co., Ltd. | — | — | 1,453 |
| Beijing Yiche Information Science and Technology Co., Ltd. | — | — | 525 |
| | — | — | 298,489 |

(20-F at 53).

150.    The revenue and profit figures, as well as those relating to Weineng, were materially false and misleading and omitted material facts when made because:

(a)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(b)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c)    Weineng was a NIO VIE. *See* ¶¶ 100-105.

(d)    NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2020. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made to Weineng on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue,

immediately upon the sale of the batteries to Weineng. *See* ¶¶ 52, 56-57, 76, 78, 84-86.

(e)    NIO's substantial year-over-year revenue increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

(f)    NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 52, 53, 59-61, 79, 85, 97-106.

151.    The 2020 Form 20-F also reported "depreciation and amortization of RMB1,046.5 million (US$160.4 million)."

152.    The depreciation and amortization figure was materially false and misleading and omitted material facts when made because it did not include depreciation of the electric batteries NIO sold to Weineng, which should have been on NIO's books because:

(a)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(b)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

153.    The 2020 Form 20-F also mischaracterized NIO's control over Weineng and mischaracterized the risks relating to Weineng, in relevant part, as follows:

Under the BaaS, we sell a battery pack to the Battery Asset Company, and the user subscribes to the usage of the battery pack from the Battery Asset Company. ***The service we provide to our users under the BaaS relies, in part, on the smooth operation of and stability and quality of service delivered by the Battery Asset Company, which we cannot guarantee. We invested in the Battery Asset Company with Contemporary Amperex Technology Co., Limited, or CATL, Hubei Science Technology Investment Group Co., Ltd. and a subsidiary of Guotai Junan International Holdings Limited, which we refer to as the Battery Asset Company Investors in this annual report. As a result, we only have limited control over the business operations of the Battery Asset Company.*** If it fails in providing high quality services to our users, we will suffer from negative customer reviews and even returns of products or services.

***If the Battery Asset Company is unable to obtain future financings from the Battery Asset Company Investors or other third parties to meet its operational needs, it may not be able to continue purchasing batteries from us and leasing them to our users,***

*or otherwise maintain its healthy and sustainable operations.* On the other hand, if the Battery Asset Company bears a significant rate of customer default on its payment obligations, its results of operations and financial performance may be materially impacted, which will in turn reduce the value of our and the Battery Asset Company Investors' investments in the Battery Asset Company. *In addition, in furtherance of the BaaS, we agreed to provide guarantee to the Battery Asset Company for the default in payment of monthly subscription fees from users, while the maximum amount of guarantee that can be claimed shall not be higher than the accumulated service fees we receive from the Battery Asset Company.* As the BaaS user base is expanding, if an increased number of default occurs, our results of operations and financial performance will be negatively affected. (20-F at 12).

154.    The bolded statements were materially false and misleading and omitted material facts when made because Defendants knew but did not disclose to investors that:

(a)    NIO was not on equal footing with the three Baas Partners involved in Weineng. NIO was the driving force behind Weineng, and Weineng's only customer and source of revenue during the Relevant Period. NIO orchestrated Weineng to benefit itself, including by materially pulling forward its revenues. The success of Weineng likewise was dependent on NIO. No other Weineng investor was similarly situated. *See* ¶¶ 52-57, 59-60, 77-79.

(b)    NIO did not merely have "limited control" over Weineng. NIO had singular and significant control over the entity. NIO ran Weineng's business (¶¶ 62-69), had overlapping senior managers and directors (¶¶ 70-74), assisted Weineng in obtaining financing to fund its operations, i.e. the purchase of batteries from NIO (¶¶ 79, 81-83, 92) and even provided a guarantee to Weineng for the default in payment of monthly subscription fees (¶¶ 65, 103, 105). Weineng's business was completely dependent on NIO. *See* ¶¶ 62-69. No other Weineng investor was similarly situated. *See* ¶¶ 52-60.

(c)    Weineng did not actually provide meaningful "services" to NIO's users. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 62-69.

(d)    Weineng was undercapitalized and would necessarily have to raise money to stay in business. Given that Weineng was needed to support NIO's revenue recognition scheme during the Relevant Period, NIO was uniquely responsible to secure financing for Weineng and even bore the risk of user defaults in monthly payments. *See* ¶¶ 65, 79-83, 87, 89, 91, 92, 103-105.

(e)    There was a serious undisclosed risk relating to NIO not characterizing Weineng as a VIE under GAAP, as it should have, and wrongfully recognizing all of Weineng's battery sales revenue immediately.

(f)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(g)      NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(h)      Weineng was a NIO VIE. *See* ¶¶ 98-105.

155.    This Form 20-F also provided the following lists disclosing NIO's principal subsidiaries and VIEs:

| Subsidiaries | Equity interest held | Place and date of incorporation or date of acquisition | Principal activities |
| --- | --- | --- | --- |
| NIO NextEV Limited ("NIO HK") (formerly known as NextEV Limited) | 100% | Hong Kong, February 2015 | Investment holding |
| NIO GmbH (formerly known as NextEV GmbH) | 100% | Germany, May 2015 | Design and technology development |
| NIO Holding Co., Ltd. ("NIO Holding") (formerly named NIO (Anhui) Holding Co., Ltd.) | 100% | Anhui, PRC, November 2017 | Headquarter and technology development |
| NIO Co., Ltd. ("NIO SH") (formerly known as NextEV Co., Ltd.) | 100% | Shanghai, PRC, May 2015 | Headquarter and technology development |
| NIO USA, Inc. ("NIO US") (formerly known as NextEV USA, Inc.) | 100% | United States, November 2015 | Technology development |
| XPT Limited ("XPT") | 100% | Hong Kong, December 2015 | Investment holding |
| NIO Performance Engineering Limited ("NPE") | 100% | United Kingdom, July 2019 | Marketing and technology development |
| NIO Sport Limited ("NIO Sport") (formerly known as NextEV NIO Sport Limited) | 100% | Hong Kong, April 2016 | Racing management |
| XPT Technology Limited ("XPT Technology") | 100% | Hong Kong, April 2016 | Investment holding |
| XPT Inc. ("XPT US") | 100% | United States, April 2016 | Technology development |
| XPT (Jiangsu) Investment Co., Ltd. ("XPT Jiangsu") | 100% | Jiangsu, PRC, May 2016 | Investment holding |
| Shanghai XPT Technology Limited | 100% | Shanghai, PRC, May 2016 | Technology development |
| XPT (Nanjing) E-Powertrain Technology Co., Ltd. ("XPT NJEP") | 100% | Nanjing, PRC, July 2016 | Manufacturing of E-Powertrain |
| XPT (Nanjing) Energy Storage System Co., Ltd. ("XPT NJES") | 100% | Nanjing, PRC, October 2016 | Manufacturing of battery pack |
| NIO Power Express Limited ("PE HK) | 100% | Hong Kong, January 2017 | Investment holding |
| NextEV User Enterprise Limited ("UE HK") | 100% | Hong Kong, February 2017 | Investment holding |
| Shanghai NIO Sales and Services Co., Ltd. ("UE CNHC") | 100% | Shanghai, PRC, March 2017 | Investment holding and sales and after sales management |
| NIO Energy Investment (Hubei) Co., Ltd. ("PE CNHC") | 100% | Wuhan PRC, April 2017 | Investment holding |
| Wuhan NIO Energy Co., Ltd. ("PE WHJV") | 100% | Wuhan PRC, May 2017 | Investment holding |
| XTRONICS (Nanjing) Automotive Intelligent Technologies Co. Ltd. ("XPT NJWL") | 50% | Nanjing, PRC, June 2017 | Manufacturing of components |
| XPT (Jiangsu) Automotive Technology Co., Ltd. ("XPT AUTO") | 100% | Nanjing, PRC, May 2018 | Investment holding |

| VIE and VIE's subsidiaries | Economic interest held | Place and Date of incorporation or date of acquisition |
| --- | --- | --- |
| Prime Hubs Limited ("Prime Hubs") | 100% | BVI, October 2014 |
| NIO Technology Co., Ltd. ("NIO SHTECH") (formerly known as Shanghai NextEV Technology Co., Ltd.) | 100% | Shanghai, PRC, November 2014 |
| Beijing NIO Network Technology Co., Ltd. ("NIO BJTECH") | 100% | Beijing, PRC, July 2017 |
| Shanghai Anbin Technology Co., Ltd. ("NIO ABTECH") | 100% | Shanghai, PRC, April 2018 |

(20-F at F-11).

156.    These statements were materially false and misleading and omitted material facts when made because Defendants knew but did not disclose to investors that Weineng was also a NIO VIE. Failing to disclose Weineng as a NIO VIE misrepresented to investors that the list of VIEs provided in the Form 20-F was complete and that Weineng was not a VIE. *See* ¶¶ 98-105.

157.    This Form 20-F also falsely represented that NIO prepared its financial statements in "conformity with GAAP":

> We will furnish Deutsche Bank Trust Company Americas, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP. (20-F at 143).

158.    This statement was materially false and misleading when made because NIO violated

GAAP for the following reasons:

(a)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(b)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

(d)    NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2020. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made to Weineng on the battery subscriptions. NIO could not recognize the full revenue for the battery sales*, i.e.,* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 52, 56-57, 76, 78, 84-86.

159.    The 2021 Form 20-F also contained misleading Certifications by Defendants Li and

Feng. Those certifications stated as follows:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report. (20-F at Exhibits 12.1 and 12.2).

160.    These certifications were materially false and misleading when made because the

2021 Form 20-F contained untrue statements of material fact, omitted material facts, and did not

fairly present NIO's financial condition because Defendants knew or recklessly disregarded that:

(a)    Under GAAP, the financial statements of a company, including disclosure of VIEs and revenue recognition, are management's responsibility. *See* ¶ 31.

(b)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(c)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(d)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

(e) NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2020. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made to Weineng on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 52, 56-57, 76, 78, 84-86.

**G. April 29, 2021 Q1 2021 Financial Results and April 30, 2021 Conference Call**

161. On April 29, 2021, NIO issued a press release with its Q12021 financial results. The press release, which was signed by Defendant Feng stated in part that:

> Total revenues were RMB7,982.3 million ($1,218.3 million) in the first quarter of 2021, representing an increase of 481.8% from the first quarter of 2020 and an increase of 20.2% from the fourth quarter of 2020.

> Gross profit was RMB1,554.8 million ($237.3 million) in the first quarter of 2021, representing an increase of RMB1,722.3 million from a gross loss of RMB167.5 million in the first quarter of 2020 and an increase of 36.2% from the fourth quarter of 2020.

162. The statements were materially false and misleading and omitted material facts when made because:

(a) NIO was Weineng's primary beneficiary. *See* ¶¶ 53-69, 100-103, 107.

(b) NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c) Weineng was a NIO VIE. *See* ¶¶ 98-105.

(d) NIO improperly included in its financial figures the full price for batteries sold to Weineng during 1Q21. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made to Weineng on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 52, 56-57, 76, 78, 86.

(e) NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

(f)    NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 52, 53, 59-61, 79, 86, 97-106.

(g)    NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was not likely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low. *See* ¶¶ 107-112.

163.    On April 30, 2021, NIO held a conference call with analysts. During that call, in which Defendant Li participated, Defendant Feng reiterated NIO's Q12021 revenues and profit.

164.    These statements were materially false and misleading and omitted material facts when made for the reasons given in ¶ 162.

**H.    August 11, 2021 Q2 2021 Financial Results and August 12, 2021 Conference Call**

165.    On August 11, 2021, NIO issued a press release with its Q22021 financial results. That press release, which was also issued on a Form 6-K signed by Defendant Feng, provided in relevant part that:

Total revenues were RMB8,448.0 million ($1,308.4 million) in the second quarter of 2021, representing an increase of 127.2% from the second quarter of 2020 and an increase of 5.8% from the first quarter of 2021.

Gross profit was RMB1,573.9 million ($243.8 million) in the second quarter of 2021, representing an increase of 402.7% from the second quarter of 2020 and an increase of 1.2% from the first quarter of 2021.

166.    These statements were materially false and misleading and omitted material facts when made because:

(a)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(b)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

(d)    NIO improperly included in its financial figures the full price for batteries sold to Weineng during Q22021. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were

made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 52, 56-57, 76, 78, 88.

(e)     NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

(f)     NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 52, 53, 59-61, 79, 88, 97-106.

(g)     NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was unlikely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low and its ability to repeatedly secure financing was highly uncertain. *See* ¶¶ 107-112.

167.     On August 12, 2021, NIO held a conference call to discuss its Q22021 financial results. During that call, in which Defendant Li participated, Defendant Feng reiterated NIO's Q22021 revenues and profits.

168.     The statements were materially false and misleading and omitted material facts when made for the reasons given in ¶ 166.

169.     During this conference call, Defendant Li also discussed the depreciation of NIO's battery assets:

For the conservative perspective, we shortened our depreciation and amortizing period for our existing products. So that will lead to the D&A increase, so for the second half year of 2021, this impact to gross profit margin will be like 2% per vehicle.

170.     These statements were materially false and misleading and omitted material facts when made because NIO underreported its battery asset depreciation by wrongfully offloading the battery assets onto Weineng's books. *See* ¶¶ 52, 53, 59-61, 79, 86, 97-106.

## I.     September 7, 2021 Prospectus

171.     On September 7, 2021, NIO filed with the SEC a prospectus pursuant to Rule 424(b)(5). The prospectus was filed in connection with the NIO's offering of up to $2,000,000,000

of ADSs, each representing one Class A ordinary share of NIO, with an assumed offering price of $40.37 per ADS, which was the last reported closing price of NIO's ADSs on September 3, 2021. The prospectus was filed pursuant to a June 9, 2020 Registration Statement signed by Defendants Li, Feng, Qin, Wu, Lee, and Mitchell. The prospectus provided, in relevant part, that:

> *We invested in the Battery Asset Company together with the Battery Asset Company Investors. As a result, we only have limited control over the business operations of the Battery Asset Company. If it fails in delivering smooth and stable operations, we will suffer from negative customer reviews and even returns of products or services and our reputation may be materially and adversely affected. Additionally, given that we generate a portion of our total revenues from receiving payment for purchase batteries* and service fees from the Battery Asset Company, our results of operations and financial performance will be negatively affected if the Battery Asset Company fails to operate smoothly….

> *The promise to transfer the control of the battery packs to Battery Asset Company is the only performance obligation in the contract with Battery Asset Company for the sales of battery packs and revenue is recognized at a point in time when the control is transferred….*

> Together with the launch of the BaaS, the Group entered into service agreements with Weineng, pursuant to which the Group provides services to Weineng including battery packs monitoring, maintenance, upgrade, replacement, IT system support, etc., with monthly service charges. In case of any default in payment of monthly rental fees from users, Weineng also has right to request the Group to track and lock down the battery subscribed by the users to limit its usage. In addition, in furtherance of the BaaS, the Group agreed to provide guarantee to Weineng for the default in payment of monthly subscription fees from users. The maximum amount of guarantee that can be claimed by Weineng for the users' payment default shall not be higher than the accumulated service fees the Group receives from Weineng.

> For services provided to Weineng, revenue is recognized over the period when services are rendered. As for financial guarantee liabilities, the provision of guarantee is linked to and associated with services rendered to Weineng and the payment of guarantee amount is therefore accounted for as the reduction to the revenue from Weineng. The fair value of the guarantee liabilities is determined by taking considerations of the default pattern of the Group's existing battery installment programs provided to users. At each period end, the financial liabilities are remeasured with the corresponding changes recorded as the reduction to the revenue. As of June 30, 2021, both service revenue and guarantee liability were immaterial. (424B5 at S-22).

172.    The statements were materially false and misleading when made because Defendants knew but did not disclose to investors that:

61

(a)    NIO was not on equal footing with the "Battery Asset Company Investors". NIO was the driving force behind Weineng, and Weineng's only customer and source of revenue during the Relevant Period. NIO orchestrated Weineng to benefit itself, including by pulling forward its revenues. The success of Weineng likewise was dependent on NIO. No other Weineng investor was similarly situated. *See* ¶¶ 52-57, 59-60, 77-79.

(b)    NIO did not merely have "limited control" over Weineng. NIO had singular and significant control over the entity. NIO ran Weineng's business (¶¶ 62-69), had overlapping senior managers and directors (¶¶ 70-74), assisted Weineng in obtaining financing to fund its operations, *i.e.,* the purchase of batteries from NIO (¶¶ 79, 81-83, 92) and even provided a guarantee to Weineng for the default in payment of monthly subscription fees (¶¶ 67, 103, 105). Weineng's business was completely dependent on NIO. *See* ¶¶ 62-69. No other Weineng investor was similarly situated. *See* ¶¶ 52-60.

(c)    Weineng's operations were completely controlled by NIO. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 62-69, 83, 91, 92.

(d)    Weineng did not actually provide meaningful "services" to NIO's users. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 62-69, 83, 91, 92.

(e)    Weineng was undercapitalized and would necessarily have to raise money to stay in business. Given that Weineng was needed to support NIO's revenue recognition scheme during the Relevant Period, NIO was uniquely responsible to secure financing for Weineng and even bore the risk of user defaults in monthly payments. *See* ¶¶ 65, 79-83, 87, 89, 91, 92, 103-105.

(f)    There was a serious risk relating to NIO not disclosing Weineng as a VIE under GAAP, as it should have, and wrongfully recognizing all of Weineng's battery sales revenue immediately. *See* ¶¶ 77, 84-86, 88, 90, 94, 96.

(g)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(h)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(i)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

(j)    NIO improperly included in its financial figures the full price for batteries sold to Weineng upon transfer of the battery packs. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made to Weineng on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a

half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 52, 56-57, 76, 89.

(k)    NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was not likely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low. *See* ¶¶ 107-112.

**J.    November 9, 2021 Q3 2021 Financial Results and November 10, 2021 Conference Call**

173.    On November 9, 2021, NIO issued a press release with its Q32021 financial results.

The press release, which was signed by Defendant Feng stated:

Total revenues were RMB9,805.3 million ($1,521.8 million) in the third quarter of 2021, representing an increase of 116.6% from the third quarter of 2020 and an increase of 16.1% from the second quarter of 2021.

Gross profit was RMB1,993.2 million ($309.3 million) in the third quarter of 2021, representing an increase of 240.3% from the third quarter of 2020 and an increase of 26.6% from the second quarter of 2021.

174.    These statements were materially false and misleading and omitted material facts when made because:

(a)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(b)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

(d)    NIO improperly included in its financial figures the full price for batteries sold to Weineng during Q32021. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 52, 56-57, 76, 78, 90.

(e)    NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id*.

(f)    NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances

because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 52, 53, 59-61, 79, 90, 97-106.

(g)     NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was not likely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low and its ability to repeatedly secure financing was highly uncertain. *See* ¶¶ 107-112.

175.    During the November 10, 2021 call, in which Defendant Li participated, Defendant Feng reiterated NIO's Q32021 results and supposedly tremendous revenue growth.

176.    These statements were materially false and misleading and omitted material facts when made for the reasons given in ¶ 174.

**K.     February 28, 2022 6-K Supplemental and Updated Disclosures**

177.    On February 28, 2022, NIO filed a Form 6-K updating disclosures about the Company's listing on the Hong Kong stock exchange. Defendant Feng signed the Form 6-K. The Form 6-K provided, in relevant part, that:

> For the year ended December 31, 2021, over half of the users that we delivered vehicles to chose BaaS subscription…. For the nine months period ended September 30, 2021, the Battery Asset Company generated revenue of RMB191.7 million and net profit of RMB37.0 million…. For the year ended December 31, 2020, the Battery Asset Company generated revenue of RMB5.1 million and net profit of RMB4.2 million. For the nine months period ended September 30, 2021, the Battery Asset Company generated revenue of RMB191.7 million and net profit of RMB37.0 million…
>
> Our gross profit increased significantly from RMB731.5 million in the nine months ended September 30, 2020 to RMB5,121.9 million (US$794.9 million) in the nine months ended September 30, 2021. The increase of gross profit compared to the nine months ended September 30, 2020 was mainly driven by the increase of vehicle delivery volume and vehicle margin.

178.    These statements were materially false and misleading when made because Defendants knew but did not disclose to investors that:

(a)     NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(b)     NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c)     Weineng was a NIO VIE. *See* ¶¶ 98-105.

(d)     NIO improperly included in its financial figures the full price for batteries sold to Weineng during the first nine months of 2021. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 97-106.

(e)     NIO's substantial revenue increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

(f)     NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 52, 53, 59-61, 79, 94, 97-106.

(g)     NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was unlikely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low and its ability to repeatedly secure financing was highly uncertain. *See* ¶¶ 107-112.

**L.      March 24, 2022 FY2021 Financial Results and Conference Call**

179.    On March 24, 2022, NIO issued a press release with its FY2021 financial results and held a conference call discussing those results with analysts. The press release, which was also filed as a Form 6-K and signed by Defendant Feng reported Q42021 and FY2021 results as follows:

Total revenues were RMB9,900.7 million (US$1,553.6 million) in the fourth quarter of 2021, representing an increase of 49.1% from the fourth quarter of 2020 and an increase of 1.0% from the third quarter of 2021.

Gross profit was RMB1,699.5 million (US$266.7 million) in the fourth quarter of2021, representing an increase of 48.8% from the fourth quarter of 2020 and a decrease of 14.7% from the third quarter of 2021.

Total revenues were RMB36,136.4 million ($5,670.6 million) for the full year of 2021, representing an increase of 122.3% from the previous year.

Gross profit was RMB6,821.4 million ($1,070.4 million) for the full year of 2021, representing an increase of 264.1% from the previous year.

180.    These statements were materially false and misleading when made because Defendants knew but did not disclose to investors that:

    (a)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

    (b)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

    (c)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

    (d)    NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2021 and Q42021. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 97-106.

    (e)    NIO's substantial revenue increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id*.

    (f)    NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 52, 53 59-61, 79, 94, 97-106.

    (g)    NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP it was unlikely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low and its ability to repeatedly secure financing was highly uncertain. *See* ¶¶ 107-112.

181.    During the March 24, 2022 conference call, in which Defendant Li participated, Defendant Feng reiterated NIO's Q42021 and FY2021 results and revenue growth.

182.    These statements were materially false and misleading and omitted material facts when made for the reasons given in ¶ 180.

**M.    April 29, 2022 2021 Form 20-F**

183.    On April 29, 2022, NIO filed its annual report on Form 20-F with the SEC, signed by Defendant Li. The Form 20-F reported NIO's FY2021 revenues:

For the full year 2021, NIO's total revenues were RMB36,136.4 million....

Our gross profit increased significantly from RMB1,873.4 million in 2020 to RMB6,821.4 million (US$1,070.4 million) in 2021. The increase of gross profit compared to 2020 was mainly driven by the increase of vehicle delivery volume and vehicle margin. (20-F at 11, 126).

184. These statements were materially false and misleading and omitted material facts when made for the reasons given in ¶ 180.

185. Charts in the 2021 Form 20-F reported total revenue of $5.2 billion, as well as sales to Weineng of $4.1 billion RMB (approximately $650,000,000) and account receivables from Weineng of approximately $1.5 billion RMB (approximately $250,000,000):

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2020 | 2021 | |
| | RMB | RMB | RMB | US$ |
| | | (in thousands) | | |
| **Revenues:**[1] | | | | |
| Vehicle sales | 7,367,113 | 15,182,522 | 33,169,740 | 5,205,056 |
| Other sales[3] | 457,791 | 1,075,411 | 2,966,683 | 465,537 |
| **Total revenues** | 7,824,904 | 16,257,933 | 36,136,423 | 5,670,593 |
| **Cost of sales:**[2] | | | | |
| Vehicle sales | (8,096,035) | (13,255,770) | (26,516,643) | (4,161,040) |
| Other sales | (927,691) | (1,128,744) | (2,798,347) | (439,122) |
| **Total cost of sales** | (9,023,726) | (14,384,514) | (29,314,990) | (4,600,162) |
| **Gross (loss)/profit** | (1,198,822) | 1,873,419 | 6,821,433 | 1,070,431 |
| Operating expenses:[2] | | | | |
| Research and development[2] | (4,428,580) | (2,487,770) | (4,591,852) | (720,562) |
| Selling, general and administrative[2] | (5,451,787) | (3,932,271) | (6,878,132) | (1,079,329) |
| Other operating (loss)/income, net | — | (61,023) | 152,248 | 23,891 |
| **Total operating expenses** | (9,880,367) | (6,481,064) | (11,317,736) | (1,776,000) |
| **Loss from operations** | (11,079,189) | (4,607,645) | (4,496,303) | (705,569) |
| Interest and investment income | 160,279 | 166,904 | 911,833 | 143,086 |
| Interest expenses | (370,536) | (426,015) | (637,410) | (100,024) |
| Share of (loss)/income of equity investees | (64,478) | (66,030) | 62,510 | 9,809 |
| Other income/(losses), net | 66,160 | (364,928) | 184,686 | 28,981 |
| **Loss before income tax expenses** | (11,287,764) | (5,297,714) | (3,974,684) | (623,717) |
| Income tax expense | (7,888) | (6,368) | (42,265) | (6,632) |
| **Net loss** | (11,295,652) | (5,304,082) | (4,016,949) | (630,349) |

*(v) Sales of goods*

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| Wuhan Weineng Battery Assets Co., Ltd. | — | 290,135 | 4,138,187 |
| Beijing Yiche Interactive Advertising Co.,Ltd. | — | 1,453 | 485 |
| Kunshan Siwopu Intelligent Equipment Co., Ltd. | — | — | 370 |
| Shanghai Weishang Business Consulting Co., Ltd. | — | — | 157 |
| Beijing Bit Ep Information Technology Co., Ltd | — | 4,402 | — |
| Beijing Bitauto Interactive Technology Co., Ltd. | — | 1,974 | — |
| Beijing Yiche Information Science and Technology Co., Ltd. | — | 525 | — |
| Total | — | 298,489 | 4,139,199 |

*(b) The Group had the following significant related party balances:*

*(i) Amounts due from related parties*

| | As of December 31, | |
|---|---|---|
| | 2020 | 2021 |
| Wuhan Weineng Battery Assets Co., Ltd. | 118,779 | 1,563,757 |
| Nanjing Weibang Transmission Technology Co., Ltd. | 509 | 268 |
| Weilan (Note 10) | 50,000 | — |
| Kunshan Siwopu Intelligent Equipment Co., Ltd. | 617 | — |
| Total | 169,905 | 1,564,025 |

Charts at 121, F-52 and F-54.

186.    These revenue, sale of goods, and accounts receivable figures were materially false and misleading because they were artificially inflated since they included the full price for batteries sold to Weineng during FY2021, which violated GAAP because:

(a)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(b)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

(d)    NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2021. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 97-106.

(e)    NIO's substantial revenue increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

(f)    NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was not likely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low. *See* ¶¶ 107-112.

187.    This Form 20-F also reported the following depreciation and amortization of RMB1,708.0 million (US$268.0 million). *See* 2021 Form 20-F at 131 and F-10.

188.    This figure was materially false and misleading because it failed to disclose that NIO underreported its battery asset depreciation by wrongfully offloading the battery assets on to

Weineng's books. GAAP accounting required NIO to include the battery asset depreciation because, as a VIE, Weineng's financials should have been consolidated with NIO's. Defendants should have included these batteries in the depreciation figure because:

      (a)     NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

      (b)     NIO had a controlling financial interest in Weineng. *See* ¶¶ 102-105.

      (c)     Weineng was a NIO VIE and, thus, its assets, including depreciating assets, should have been consolidated with NIO's. *See* ¶¶ 98-105.

189.    This Form 20-F (at F-11) also provided the following lists disclosing NIO's principal subsidiaries and VIEs:

| Subsidiaries | Equity interest held | Place and Date of incorporation or date of acquisition | Principal activities |
|---|---|---|---|
| NIO Nextev Limited ("NIO HK") (formerly known as Nextev Limited) | 100% | Hong Kong, February 2015 | Investment holding |
| NIO GmbH (formerly known as NextEV GmbH) | 100% | Germany, May 2015 | Design and technology development |
| NIO Holding Co., Ltd. ("NIO Holding") (formerly known as NIO (Anhui) Holding Co., Ltd.) | 100% | Anhui, PRC, November 2017 | Headquarter and technology development |
| NIO Co., Ltd. ("NIO SH") (formerly known as NextEV Co., Ltd.) | 100% | Shanghai, PRC, May 2015 | Headquarter and technology development |
| NIO Automobile (Anhui) Co., Ltd. ("NIO AH") | 100% | Anhui, PRC, August 2020 | Industrialization and technology development |
| NIO Automobile Technology (Anhui) Co., Ltd. ("NIO R&D") | 100% | Anhui, PRC, August 2020 | Design and technology development |
| NIO Financial Leasing Co., Ltd. ("NIO Leasing") | 100% | Shanghai, PRC, August 2018 | Financial Leasing |
| NIO USA, Inc. ("NIO US") (formerly known as NextEV USA, Inc.) | 100% | United States, November 2015 | Technology development |
| XPT Limited ("XPT") | 100% | Hong Kong, December 2015 | Investment holding |
| XPT Technology Limited ("XPT Technology") | 100% | Hong Kong, April 2016 | Investment holding |
| XPT Inc. ("XPT US") | 100% | United States, April 2016 | Technology development |
| XPT (Jiangsu) Investment Co., Ltd. ("XPT Jiangsu") | 100% | Jiangsu, PRC, May 2016 | Investment holding |
| NIO Norway AS ("NIO NO") | 100% | Norway, January 2021 | Investment holding and sales and after sales management |
| NEU Battery Asset Co., Ltd. ("BAC Cayman") | 100% | Cayman Islands, May 2021 | Investment holding |
| NEU Battery Asset (Hong Kong) Co.Limited ("BAC HK") | 100% | Hong Kong, July 2021 | Investment holding |
| Instant Power Europe B.V. ("BAC NL") Co., Limited | 100% | Netherlands, June 2021 | Battery Subscription Service |
| NIO Nextev Europe Holding B.V.("NIO NL") | 100% | Netherlands, December 2020 | Investment holding |
| Shanghai XPT Technology Limited | 100% | Shanghai, PRC, May 2016 | Technology development |
| XPT (Nanjing) E-Powertrain Technology Co., Ltd. ("XPT NJEP") | 100% | Nanjing, PRC, July 2016 | Manufacturing of E-Powertrain |
| XPT (Nanjing) Energy Storage System Co., Ltd. ("XPT NJES") | 100% | Nanjing, PRC, October 2016 | Manufacturing of battery pack |
| NIO Power Express Limited ("PE HK) | 100% | Hong Kong, January 2017 | Investment holding |
| NIO User Enterprise Limited ("UE HK) | 100% | Hong Kong, February 2017 | Investment holding |
| NIO Sales and Services Co., Ltd. ("UE CNHC") (formerly known as Shanghai NIO Sales and Service Co., Ltd. ) | 100% | Shanghai, PRC, March 2017 | Investment holding and sales and after sales management |
| NIO Energy Investment (Hubei) Co., Ltd. ("PE CNHC") | 100% | Wuhan PRC, April 2017 | Investment holding |
| Wuhan NIO Energy Co., Ltd. ("PE WHJV") | 100% | Wuhan, PRC, May 2017 | Investment holding |
| XTRONICS (Nanjing) Automotive Intelligent Technologies Co. Ltd. ("XPT NJWL") | 50% | Nanjing, PRC, June 2017 | Manufacturing of components |
| XPT (Jiangsu) Automotive Technology Co., Ltd. ("XPT AUTO") | 100% | Nanjing, PRC, May 2018 | Investment holding |

| VIE and VIE's subsidiaries | Place and Date of incorporation or date of acquisition |
|---|---|
| Prime Hubs Limited ("Prime Hubs") | BVI, October 2014 |
| Beijing NIO Network Technology Co., Ltd. ("Beijing NIO") | Beijing, PRC, July 2017 |

**List of Principal Subsidiaries and Consolidated Variable Interest Entities**

| Subsidiaries: | Place of incorporation |
|---|---|
| NIO Nextev Limited | Hong Kong |
| XPT Limited | Hong Kong |
| XPT Technology Limited | Hong Kong |
| NEU Battery Asset (Hong Kong) Co., Limited | Hong Kong |
| NIO Power Express Limited | Hong Kong |
| NIO User Enterprise Limited | Hong Kong |
| NIO USA, Inc. | California, United States |
| XPT Inc. | Delaware, United States |
| Instant Power Europe B.V. | Netherlands |
| NIO Nextev Europe Holding B.V. | Netherlands |
| NEU Battery Asset Co., Ltd. | Cayman Islands |
| NIO Norway AS | Norway |
| NIO GmbH | Germany |
| NIO Holding Co., Ltd. | PRC |
| NIO Co., Ltd. | PRC |
| NIO Automobile (Anhui) Co., Ltd. | PRC |
| NIO Automobile Technology (Anhui) Co., Ltd. | PRC |
| NIO Financial Leasing Co., Ltd. | PRC |
| XPT (Jiangsu) Investment Co., Ltd. | PRC |
| Shanghai XPT Technology Limited | PRC |
| XPT (Nanjing) E-Powertrain Technology Co., Ltd. | PRC |
| XPT (Nanjing) Energy Storage System Co., Ltd. | PRC |
| NIO Sales and Services Co., Ltd. | PRC |
| NIO Energy Investment (Hubei) Co., Ltd. | PRC |
| Wuhan NIO Energy Co., Ltd. | PRC |
| XTRONICS (Nanjing) Automotive Intelligent Technologies Co. Ltd. | PRC |
| XPT (Jiangsu) Automotive Technology Co., Ltd. | PRC |
| **Consolidated variable interest entity:** | **Place of incorporation** |
| Beijing NIO Network Technology Co., Ltd. | PRC |

20-F at Ex. 8.1.

190.    The lists of NIO's principal subsidiaries and VIEs were materially false and misleading and omitted material facts when made because they misrepresented that NIO's list of VIEs in the Form 20-F was complete, failed to disclose that Weineng was a NIO VIE, and gave the false impression that Weineng was not a NIO VIE.

191.    The Form 20-F also represented, in pertinent part:

As a result of the several rounds of financings of the Battery Asset Company, we currently beneficially own approximately 19.8% of the equity interests in the Battery Asset Company. We refer to the Initial BaaS Investors together with the other investors of the Battery Asset Company that subsequently joined as the Battery Asset Company Investors. As a result, we only have limited control over the business

70

operations of the Battery Asset Company. If it fails in delivering smooth and stable operations, we will suffer from negative customer reviews and even returns of products or services and our reputation may be materially and adversely affected.

Additionally, given that we generate a portion of our total revenues from sales of battery purchases and provision of service to the Battery Asset Company, our results of operations and financial performance will be negatively affected if the Battery Asset Company fails to operate smoothly. The Battery Asset Company may finance the purchase of batteries through issuance of equity and debt or bank borrowing. If the Battery Asset Company is unable to obtain future financings from the Battery Asset Company Investors or other third parties to meet its operational needs, it may not be able to continue purchasing batteries from us and providing them to our users through battery subscription, or otherwise maintain its healthy and sustainable operations….(20-F at 21)

192.    These statements were materially false and misleading and omitted material facts when made because Defendants failed to disclose:

(a)    NIO's disproportionately large economic interest in Weineng. *See* ¶¶ 52-57, 59-60, 77-79, 100-105.

(b)    NIO was not on equal footing with the "three Baas Partners" involved in Weineng. NIO was the driving force behind Weineng, and Weineng's only source of revenue during the Relevant Period. NIO orchestrated Weineng to benefit itself by materially pulling forward its revenue. Weineng's success was dependent on NIO, and vice versa. No other Weineng investor was similarly situated. *See* ¶¶ 52-57, 59-60, 77-79, 100-105.

(c)    NIO did not merely have "limited control" over Weineng. NIO had singular and significant control over the entity. NIO ran Weineng's business (¶¶ 62-69), had overlapping senior managers and directors (¶¶ 70-74), assisted Weineng in obtaining financing to fund its operations, *i.e.,* the purchase of batteries from NIO (¶¶ 79, 81-83, 92) and even provided a guarantee to Weineng for the default in payment of monthly subscription fees (¶¶ 65, 103, 105). Weineng's business was completely dependent on NIO. *See* ¶¶ 62-69. No other Weineng investor was similarly situated. *See* ¶¶ 52-60.

(d)    Weineng's operations were completely controlled by NIO. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 62-75.

(e)    Weineng did not actually provide meaningful "services" to NIO's users. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 62-69.

(f)     Weineng was undercapitalized and would necessarily have to raise money to stay in business. Given that Weineng was needed to support NIO's revenue recognition scheme during the Relevant Period, NIO was uniquely responsible to secure financing for Weineng and even bore the risk of user defaults in monthly payments. *See* ¶¶ 65, 79-83, 87, 89, 91, 92, 103-105.

(g)     There was a serious risk relating to NIO not disclosing Weineng as a VIE under GAAP, as it should have, and wrongfully recognizing all of Weineng's battery sales revenue immediately. *See* ¶¶ 77, 84-86, 88, 90, 94, 96.

(h)     NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(i)     NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(j)     Weineng was a NIO VIE. *See* ¶¶ 98-103.

193.    The Form 20-F also falsely represented that NIO prepared its financial statements in

"conformity with GAAP":

We will furnish Deutsche Bank Trust Company Americas, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP. (20-F at 163).

194.    This statement was materially false and misleading when made because NIO violated

GAAP because:

(a)     NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(b)     NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(c)     Weineng was a NIO VIE. *See* ¶¶ 98-105.

(d)     NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2021. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 97-106.

195.    The 2022 Form 20-F also contained Certifications signed by Defendants Li and Feng.

Those certifications stated as follows:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;…(20-F at Exhibits 12.1 and 12.2)

196.    These certifications were materially false and misleading when made because the 2021 Form 20-F contained untrue statements of material fact, omitted material facts and did not fairly present NIO's financial condition because:

(a)    Under GAAP, the accuracy of financial statements, including the disclosure of VIEs and revenue recognition, are management's responsibility. *See* ¶ 31.

(b)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.

(c)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.

(d)    Weineng was a NIO VIE. *See* ¶¶ 98-105.

(e)    NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2021. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.,* five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 97-106.

(f)    NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

(g)    NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 52, 53, 59-61, 79, 94, 97-106.

(h)    NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was not likely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low and its ability to repeatedly secure financing was highly uncertain. *See* ¶¶ 107-112.

**N.    June 9, 2022 Q1 2022 Financial Results and Conference Call**

197.    On June 9, 2022, NIO issued a press release and held a conference call with analysts

discussing the Company's Q12022 financial results. The press release, which was also filed as a Form

6-K and signed by Defendant Feng, stated:

> Total revenues were RMB9,910.6 million ($1,563.4 million) in the first quarter of
> 2022, representing an increase of 24.2% from the first quarter of 2021 and an increase
> of 0.1% from the fourth quarter of 2021.
>
> Gross profit was RMB1,446.8 million ($228.2 million) in the first quarter of 2022,
> representing a decrease of 6.9% from the first quarter of 2021 and a decrease of 14.9%
> from the fourth quarter of 2021.

198.    The statements were materially false and misleading when made because Defendants

knew, but did not disclose to investors that:

> (a)    NIO was Weineng's primary beneficiary. *See* ¶¶ 52-69, 100-103, 106.
>
> (b)    NIO had a controlling financial interest in Weineng. *See* ¶¶ 100-105.
>
> (c)    Weineng was a NIO VIE. *See* ¶¶ 98-105.
>
> (d)    NIO improperly included in its financial figures the full price for batteries sold
> to Weineng during Q12022. GAAP required NIO to consolidate Weineng's
> financials into NIO's because it was a VIE. Accordingly, NIO could only
> properly recognize revenues on leased batteries as payments were made on the
> battery subscriptions. NIO could not recognize the full revenue for the battery
> sales, *i.e.,* five to six and a half years of revenue, upon the sale of the batteries
> to Weineng. *See* ¶¶ 52, 56-57, 76, 78, 96.
>
> (e)    NIO's substantial year-over-year revenue percentage increase was due in part
> to the Company's recognition of the full sale of leased batteries to Weineng
> immediately in violation of GAAP. *See id.*
>
> (f)    NIO's gross profit statements failed to account for the depreciation of the
> leased batteries, which GAAP accounting required under these circumstances
> because Weineng's financials should have been consolidated with NIO's. *See*
> ¶¶ 52, 53, 59-61, 79, 96, 97-106.
>
> (g)    NIO separately could not recognize the full revenue for the batteries sold to
> Weineng under GAAP because it was not likely that NIO would collect monies
> Weineng owed to it within a year because Weineng's asset to liability ratio was
> so low and its ability to repeatedly secure financing was highly uncertain. *See*
> ¶¶ 107-112.

199.    Also on June 9, 2022, NIO held a conference call with analysts discussing the Company's Q12022 financial results. During that call, in which Defendant Li participated, Defendant Feng reiterated NIO's Q12022 revenues.

200.    These statements were materially false and misleading and omitted material facts for the reasons given in ¶ 198.

## VII.    THE TRUTH IS SLOWLY DISCLOSED: GRIZZLY REVEALS THAT NIO SIGNIFICANTLY CONTROLLED WEINENG AND USED IT TO UNLAWFULLY PULL FORWARD BATTERY LEASING REVENUE

201.    On June 28, 2022, Grizzly revealed that NIO largely controlled Weineng, which it used as a way to radically accelerate its revenues and earnings by keeping Weineng as an unconsolidated, off-balance sheet entity. The Grizzly Report stated in relevant part:

> We have discovered that NIO has used Wuhan Weineng, an unconsolidated related party entity, to inflate its revenues and boost margins… *We define revenue that has been "pulled-forward" as any revenue beyond what NIO would have received in the first year of subscriptions had it consolidated Weineng as a subsidiary….* NIO's financials have been overstated through a scheme using an unconsolidated, related party…. Since Weineng Battery was formed in August 2020, NIO has found it to be a reliable and growing stream of revenue. In just four months of operating in 2020, NIO generated 290 million RMB from sales to Weineng. Despite this quick start, revenue attributable to the entity ballooned even further in 2021 to 4.14 billion RMB representing ~11% of overall 2021 revenue. The arrangement between Weineng and NIO has…[p]ull[ed] forward several years of revenue to help meet ambitious estimates [and] [s]hift[ed] depreciation costs off [NIO's] financial statements.

202.    On June 29, 2022, after the Grizzly Report was released, NIO, without any analysis, denied the allegations wholesale without providing any explanation or reasoning:

> The report is without merit and contains numerous errors, unsupported speculations and misleading conclusions and interpretations regarding information relating to the Company. The Company's board of directors, including the audit committee, is reviewing the allegations and considering the appropriate course of action to protect the interests of all shareholders. The Company will make additional disclosures in due course consistent with the requirements of applicable rules and regulations of the Securities and Exchange Commission, the New York Stock Exchange, The Stock Exchange of Hong Kong Limited (the "SEHK") and the Singapore Exchange Securities Trading Limited (the "SGX-ST"). The Company emphasizes its continued and unwavering commitment to maintaining high standards of corporate governance

and internal control, as well as transparent and timely disclosure in compliance with applicable rules and regulations.

203.    On June 28, 2022, NIO's ADSs closed at $22.36, down 2.5% from their June 27, 2022 close of $22.95.

204.    Later on June 28, 2022, at approximately 8:00 p.m., NIO issued its first response, denying the allegations in the Grizzly Report. Then, a little over four hours later, at approximately 12:30 a.m. on June 29, 2022, NIO issued a press release again denying the Grizzly Report's allegations. On this news, in pre-market/post-market trading between 8:00 p.m. on June 28, 2022 and 6:00 a.m. on June 29, 2022, NIO's ADS price fell approximately 8.77% from $22.34 to $20.38. NIO ADSs closed on June 29, 2022 at $21.86 per share, down 2.24% from the June 28, 2022 close price of $22.36.

205.    On July 11, 2022, the market learned of the seriousness of the Grizzly Report's allegations as NIO announced that it would appoint a purportedly independent committee to investigate the Grizzly Report's merits:

> NIO Inc. (NYSE: NIO; HKEX: 9866; SGX: NIO) ("NIO" or the "Company"), a pioneer and a leading company in the premium smart electric vehicle market, today announced that following its previous statement in response to the allegations made in a report issued by the short-seller firm Grizzly Research LLC on June 28, 2022 (the "Short Seller Report"), the Company's board of directors (the "Board"), including the audit committee of the Board, after having reviewed the allegations, at the recommendation of the management of the Company and in order to protect the interests of all shareholders, has decided to form an independent committee (the "Independent Committee"), consisting of independent directors Mr. Denny Ting Bun Lee, Mr. Hai Wu, and Ms. Yu Long, to oversee an independent investigation regarding the allegations made in the Short Seller Report (the "Independent Investigation"). The Independent Committee has retained independent professional advisors to assist with the Independent Investigation, including an international law firm and a well-regarded forensic accounting firm. The Company will provide updates on the Independent Investigation in due course consistent with the requirements of applicable rules and regulations of the Securities and Exchange Commission, the New York Stock Exchange, The Stock Exchange of Hong Kong Limited (the "SEHK") and the Singapore Exchange Securities Trading Limited (the "SGX-ST"). The Company reiterates its continued and unwavering commitment to maintaining high standards of

corporate governance and internal control, as well as transparent and timely disclosure in compliance with applicable rules and regulations.

206.    After NIO's July 11, 2022 statements, the market realized that Grizzly's allegations were significant. NIO's ADSs fell almost 9%.

## VIII.    ADDITIONAL MATERIALITY ALLEGATIONS

### A.    Weineng Accounted for a Material Amount of NIO's Revenue

207.    The SEC's Staff Accounting Bulletin ("SAB") No. 99 (*available at*: https://www.sec.gov/interps/account/sab99.htm) provides a non-exhaustive list of qualitative and quantitative factors a court should consider, including whether the misstatement "affects the registrant's compliance with regulatory requirements." SAB 99.

208.    One of those factors is when a reported item comprises 5% or more of a company's earnings:

> The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material.

*See* SAB  99 at 1.

209.    Revenue attributable to Weineng in FY2021 alone was 4.14 billion RMB, or approximately $600 million, representing approximately 11% of NIO's $5.6 billion 2021 revenue alone. Accordingly, it was clearly material to NIO.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

210.    As alleged herein, Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of NIO were materially false and/or misleading when made; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding NIO, their control over and/or receipt and/or modification of NIO's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning NIO, participated in the fraudulent scheme alleged herein.

### A. Defendants Knew Their Statements Were Materially False and Misleading When Made

#### 1. Defendants Purposefully Created Weineng as an End Run Around GAAP so NIO Could Dig Out of a Liquidity Crisis and Recognize More Revenue Immediately

211.    As NIO's liquidity crisis escalated, in August 2020, Defendants set up Weineng to wrongfully pull forward years of battery lease revenue.

212.    Prior to forming Weineng, NIO ran its own battery lease program. During this period, when a consumer purchased a vehicle and leased the battery, NIO only recognized revenue from battery leases when it received the cash payments on a monthly basis.

213.    After creating Weineng, NIO began recognizing the full sale price of the electric batteries NIO sold to Weineng – although Weineng would not (like NIO pre-Relevant Period) receive that revenue for five to six and a half years.

214.    By creating Weineng and artificially pulling forward years of revenues, Defendants were able to dig NIO out of its liquidity crunch – which was so serious that NIO stated it could only last one more year as things were. *See* NIO 2019 Form 20-F at 108.

#### 2. Defendants, Who Disclosed Other VIEs, Were Well Aware of VIE Reporting Requirements

215.    As NIO's management, it was the Individual Defendants' responsibility to list Weineng as a VIE to the auditor and disclose Weineng as a VIE to investors. Defendants knew Weineng was a VIE and thus should have been consolidated with NIO because, during the Relevant

Period, NIO identified several other related entities as VIEs and consolidated their financial results, eliminating intra-company transactions.

216.    Thus, Defendants knew how to determine whether an entity was a VIE or not, and if an entity was a VIE, whether NIO was the VIE's primary beneficiary.

217.    On December 10, 2020, NIO filed a Form 6-K with the SEC, signed by Defendant Feng. This document reported NIO's unaudited financial results for the nine months ending September 3, 2020. This report listed numerous entities that were NIO VIEs:

| VIE and VIE's subsidiaries | Economic interest held | Place and Date of incorporation or date of acquisition |
|---|---|---|
| Prime Hubs Limited ("Prime Hubs") | 100% | BVI, October 2014 |
| NIO Technology Co., Ltd. ("NIO SHTECH") (formerly known as Shanghai NextEV Technology Co., Ltd.) | 100% | Shanghai, PRC, November 2014 |
| Beijing NIO Network Technology Co., Ltd. ("NIO BJTECH") | 100% | Beijing, PRC, July 2017 |
| Shanghai Anbin Technology Co., Ltd. ("NIO ABTECH") | 100% | Shanghai, PRC, April 2018 |

218.    Additionally, NIO's 2021 Form 20-F, which was signed by Defendant Li, discussed VIEs and principles of consolidation at length:

> A VIE is an entity in which the Company, or its subsidiary, through contractual arrangements, bears the risks of, and enjoys the rewards normally associated with, ownership of the entity, and therefore the Company or its subsidiary is the primary beneficiary of the entity.
>
> All significant transactions and balances between the Company, its subsidiaries and the VIE have been eliminated upon consolidation. The non-controlling interests in consolidated subsidiaries are shown separately in the consolidated financial statements.

*Id.* at F-12-13.

219.    These statements show Defendants knew what characteristics necessitated VIE treatment.

220.    Defendant Li particularly knew what characteristics qualify an entity as a VIE because he established another entity that is a VIE of NIO. *See* NIO 2020 Form 20-F at F-12.

221.    Accordingly, Defendants knew their statements about Weineng were misleading and that NIO's listing of VIEs was incomplete when made. *See supra* ¶¶ 155, 156, 189, 190.

### 3. Defendants Purposefully Set NIO's Equity Interest in Weineng at 19.84% in August 2021 to Remain a Fraction Below the 20% Figure – Which Creates a Presumption of Control

222. On August 16, 2021, NIO invested more money in Weineng – putting its equity interest at a carefully chosen 19.84%. NIO's 19.84% voting interest fell a hairsbreadth under the 20% equity/voting figure that Defendants knew would provide a presumption that NIO significantly controlled Weineng and thus was a VIE requiring consolidation of its financial statements. *See* ASC 323-10 ("[a]n investment (direct or indirect) of 20 percent or more of the voting stock of an investee shall lead to a presumption that in the absence of predominant evidence to the contrary an investor has the ability to exercise significant influence over an investee").

### B. Defendants Were Motivated to Commit Fraud

### 1. Defendants Were Motivated to Commit Fraud to Address NIO's Liquidity Crisis and Fund the Highly Capital-Intensive Battery Swap Business Model

223. NIO had a liquidity crisis in early 2020. *See supra* ¶¶ 45-51. On February 27, 2020, it was reported that NIO stated that it could be out of business in one year. *See supra* ¶ 51. Defendants were motivated to create Weineng to address this urgent crisis because Weineng would significantly accelerate revenue recognition for NIO's battery rentals and, thus, solve the liquidity crisis. NIO's creation of Weineng allowed NIO to wrongfully recognize at least RMB1.1 billion in revenue during the Relevant Period – a material amount. *See* Grizzly Report at 7.

### 2. Defendants Were Motivated to Commit Fraud to Make Offerings of Inflated NIO Securities

224. NIO had numerous stock offerings during the Relevant Period, including secondary listings on both the Main Board of the Stock Exchange of Hong Kong on March 9, 2022, and the Main Board of the Singapore Exchange Securities Trading Limited on May 20, 2022. Additionally, NIO did a secondary stock offering of ADSs in August/September 2020, raising about $1.5 billion.

In September 2021, NIO offered to sell up to $2 billion in ADSs in an at-the-market secondary offering.

225.    Defendants were motivated to commit fraud to artificially inflate the price of NIO securities and then offer artificially inflated NIO securities to the public.

## X.    LOSS CAUSATION

226.    During the Relevant Period, Defendants materially misled the investing public, including Plaintiff, thereby inflating the price of NIO's ADSs, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose materially adverse information and/or misrepresented the truth about NIO's business, operations, and prospects as alleged herein.

227.    During the Relevant Period, as detailed herein, the prices of NIO's ADSs were artificially inflated due to Defendants' misleading statements and omissions. When Defendants' misrepresentations and omissions were disclosed and became apparent to the market, the price of NIO's ADSs fell as the prior artificial inflation came out.

228.    As a result of purchases of NIO ADSs during the Relevant Period, Plaintiff suffered economic loss, *i.e.,* damages, under the securities laws. The decline in the price of NIO ADSs after the corrective disclosures on June 28, 2022 and July 11, 2022 was a direct result of Defendants' misrepresentations being revealed to investors and the market.

229.    The decline in the price of NIO ADSs was also the result of the materialization of the concealed investment risks concerning NIO.

230.    Defendants' materially false and misleading statements and omissions relate to NIO's significant control of, and wrongful accounting for, Weineng's purchase of EV batteries from NIO.

231.    The first corrective disclosure on June 28, 2022 revealed for the first time that NIO effectively controlled Weineng and had used Weineng to accelerate revenues and earnings relating to its sales of EV batteries to Weineng.

232.    After this disclosure, NIO's ADS price dropped from $22.95 to $22.36, approximately 2.5%.

233.    The final corrective disclosure on July 11, 2022 revealed the full truth. On July 11, 2022, NIO disclosed that it was forming the Committee to review Grizzly's claims – showing the market that Grizzly's allegations were serious.

234.    After the July 11, 2022 disclosure, NIO ADSs fell from a July 8, 2022 closing price of $22.60 to close on July 11, 2022 at $20.57, almost 9%.

235.    The timing and magnitude of the price declines in NIO ADSs negate any inference that the loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' statements. The economic loss, *i.e.,* damages, suffered by Plaintiff was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in the value of NIO ADSs when Defendants' misrepresentations were revealed.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE

236.    The market for NIO's ADSs was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, NIO's ADSs traded at artificially inflated prices during the Relevant Period. On February 9, 2021, the Company's ADS price closed at a Relevant Period high of $64.84 per share. Plaintiff purchased or otherwise acquired NIO ADSs relying upon the integrity of the market price of NIO's ADSs and market information relating to NIO and has been damaged thereby.

237.    During the Relevant Period, the artificial inflation of NIO's ADSs was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff. As described herein, during the Relevant Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NIO's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of NIO and its business, operations, and prospects, thus causing the price of the Company's ADSs to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's ADSs. Defendants' materially false and/or misleading statements during the Relevant Period resulted in Plaintiff purchasing the Company's ADSs at such artificially inflated prices, and Plaintiff has been damaged as a result.

238.    At all relevant times, the market for NIO's ADSs was an efficient market for the following reasons, among others: (a) NIO's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market; (b) as a regulated issuer, NIO filed periodic public reports with the SEC and/or the NYSE; (c) NIO regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or (d) NIO was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

239.    As a result of the foregoing, the market for NIO's ADSs promptly digested current information regarding NIO from all publicly available sources and reflected such information in NIO's ADS price. Under these circumstances, all purchasers of NIO's ADSs during the Relevant

Period suffered similar injury through their purchase of NIO's ADSs at artificially inflated prices and a presumption of reliance applies.

240.    Plaintiff is entitled to a presumption of reliance in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Relevant Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.    DIRECT RELIANCE

241.    Plaintiff and/or its investment managers acting on its behalf, actually, reasonably, and/or justifiably relied upon Defendants' misleading statements by, *inter alia* (i) reading the statements made by Defendants in NIO's SEC filings, press releases, and other public sources; (ii) reading analyst reports and news articles about NIO that quoted, summarized, or otherwise incorporated such statements; (iii) reading newspaper and other media accounts regarding NIO; and (iv) listening to and/or reading the transcripts of earnings conference calls and other investor presentations by NIO's management. Plaintiff did not know the false and misleading nature of Defendants' statements when it transacted in NIO ADSs during the Relevant Period.

242.    Generally, in evaluating potential investments and in making investment decisions, Plaintiff reads and relies upon publicly available information, such as SEC filings, analyst reports, and other public information concerning companies in which it might invest.

243.    In connection with its Relevant Period investments in NIO and transactions in NIO ADSs, specifically, Plaintiff read, and reasonably and justifiably relied upon, the material misrepresentations and omissions of fact alleged herein, and, on that basis, purchased NIO ADSs after each of the misleading statements alleged herein. Due to the misconduct alleged herein, Plaintiff suffered substantial monetary damages.

244.    Throughout the Relevant Period, Plaintiff's analysis of whether to purchase, hold, or sell NIO ADSs, and at what price, was affected by the accuracy of the NIO-related information it reviewed and relied upon. Had Plaintiff known the truth about the misstatements and omissions alleged herein, it would have affected Plaintiff's investment evaluations and decisions during the Relevant Period, in that Plaintiff would either not have purchased NIO ADSs at all or, if it did, it would not have done so at the price that was paid.

## XIII.   NO SAFE HARBOR

245.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was

authorized or approved by an executive officer of NIO who knew that the statement was false when made.

## XIV.   CAUSES OF ACTION

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder Against All Defendants**

246.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

247.    During the Relevant Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Plaintiff, as alleged herein; and (ii) cause Plaintiff to purchase NIO's ADSs at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

248.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADSs in an effort to maintain artificially high market prices for NIO's ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

249.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about NIO, as specified herein.

250.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct

86

as alleged herein in an effort to assure investors of NIO's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about NIO, its relationship to Weineng, and its reported financial results, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADSs during the Relevant Period.

251.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Relevant Period and members of the Company's management team or had control thereof; (ii) each of these Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financials; (iii) each of these Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances and business operations with Weineng at all relevant times; and (iv) each of these Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

252.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NIO's significant control of Weineng and the misstated financial statements

discussed herein, from the investing public and supporting the artificially inflated price of its ADSs. As demonstrated by Defendants' misstatements of the Company's relationship with Weineng, and NIO's reported revenues and earnings during the Relevant Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

253.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of NIO's ADSs was artificially inflated during the Relevant Period. In ignorance of the fact that market prices of the Company's ADSs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the ADSs trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Relevant Period, Plaintiff acquired NIO's ADSs during the Relevant Period at artificially high prices and were damaged thereby.

254.    At the time of said misrepresentations and/or omissions, Plaintiff was ignorant of their falsity and believed them to be true. Had Plaintiff known the truth regarding the problems that NIO was experiencing, which were not disclosed by Defendants, Plaintiff would not have purchased or otherwise acquired NIO ADSs, or, if Plaintiff had acquired such ADSs during the Relevant Period, Plaintiff would not have done so at the artificially inflated prices which Plaintiff paid.

255.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

256.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases and sales of NIO's ADSs during the Relevant Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

257.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

258.    The Individual Defendants acted as controlling persons of NIO within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the misstatements and omissions of material fact, including false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

259.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

260.    As set forth above, NIO and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of NIO's ADSs during the Relevant Period.

## XV.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Awarding compensatory damages in favor of Plaintiff against all defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)    Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c)    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 28, 2025

**KIRBY McINERNEY LLP**

By:  /s/ Daniel Hume
Daniel Hume
Meghan J. Summers
Ira M. Press
Sarah E. Flohr
250 Park Avenue, Suite 820
New York, N.Y. 10177
Telephone:  (212) 371-6600
Facsimile:   (212) 751-2540
dhume@kmllp.com
msummers@kmllp.com
ipress@kmllp.com
sflohr@kmllp.com

*Counsel for Plaintiff*